608 A.2d 1061

DENLINGER, INC., Appellant,

v.

Brad A. DENDLER and Pennsylvania National
Bank and Trust Company.

DENLINGER, INC.

v.

Brad A. DENDLER and Pennsylvania National
Bank and Trust Company.

Appeal of Brad A. DENDLER.

Superior Court of Pennsylvania.

Argued Jan. 30, 1992.

Filed May 11, 1992.

Nedric L. Nissly, Lancaster, for appellant.

Alan B. Ziegler, Reading, for Dendler, appellee.

Before CIRILLO, DEL SOLE and KELLY, JJ.

CIRILLO, Judge:

This is a consolidated appeal from an order entered in the Court of Common Pleas of Lancaster County granting defendant Brad A. Dendler's motion for summary judgment and denying his request for attorney's fees pursuant to 42 Pa.C.S.A. § 2503(9). Plaintiff Denlinger, Inc. is appealing the granting of summary judgment, while defendant Dendler is cross-appealing the denial of attorney's fees. We reverse the order granting summary judgment and affirm the order denying attorney's fees.

Defendant Brad Dendler ("Dendler") is the sole shareholder, president and treasurer of Blue Mountain Development Company, Inc. ("Blue Mountain"), a construction company that specializes in residential projects. Blue Mountain was incorporated under the laws of Pennsylvania on July 15, 1988, after having functioned as a *de facto* corporation since April of 1988. Prior to forming Blue Mountain, Dendler had been in the construction business for several years, operating as a sole proprietorship under the name of Blue Mountain Contractors. Plaintiff Denlinger, Inc. ("Denlinger") is a building supply company based in Lancaster, Pennsylvania. As a sole proprietor, Dendler had regularly purchased materials and supplies from Denlinger, on a cash-only basis. However, once Dendler formed Blue Mountain, he either contacted, or was contacted by, Denlinger to open a credit account. In July of 1988 Dendler was given a one page, two-sided credit application to complete. Dendler returned the completed form four to six weeks later, and an "open book" credit account was established for Blue Mountain. Essentially, it is the validity of the credit application Dendler completed which is under review here.

Blue Mountain filed a voluntary petition under Chapter Eleven of the Bankruptcy Code in May of 1990. At that time Blue Mountain owed Denlinger $44,157.94 for materials that had already been delivered and accepted. On June 26, 1990 Denlinger filed suit against Brad Dendler personally,[1] as permitted by paragraph four of the credit application, to recoup the $44,157.94 due on the account, plus $5,994.84 in finance charges,[2] and attorney's fees.[3] Dendler asserted in his answer, as an affirmative defense, that the credit application was an adhesion contract and, as such, was unconscionable and against the public policy of the Commonwealth. Dendler also counterclaimed for attorney's fees under section 2503(9) of the Judicial Code, 42 Pa. C.S.A., contending that Denlinger's suit was arbitrary, vexatious, and filed in bad faith. The trial court agreed that the credit application was an adhesion contract, and on that basis granted summary judgment in favor of Dendler. The court denied Dendler's request for attorney's fees, finding that Denlinger's conduct did not rise to the level required by section 2503(9). Denlinger filed this timely appeal; subsequently, Dendler filed a timely cross-appeal.

1. Denlinger also filed suit against Pennsylvania National Bank and Trust Company ("PNB") for the $44,157.94 in past due bills, plus attorney's fees and "interest at the legal rate." Denlinger alleges that it had increased Blue Mountain's line of credit on the basis of a letter of credit from PNB. PNB denied the allegation, stating that the letter of credit was limited to the costs incurred in erecting a residence for the Greskos, who had obtained a mortgage from PNB to finance the construction of their house. The scope of PNB's letter of credit for Dendler is the subject of a separate suit filed by Denlinger, and therefore not at issue here. In addition, PNB notified this court that it will "not be actively participating in the appeals before Superior Court."

2. Paragraph three, which delineates the payment terms governing charge accounts, provides for a two percent (2%) discount for all invoices paid by the tenth of the month in which they are due, and up to a two percent (2%) per month finance charge for all invoices not paid in full in the month they are due.

3. Paragraph five of the credit application reads in part: "In the event that Applicant's account is referred to an attorney for collection, Applicant agrees that Denlinger, Inc. shall be entitled to collect, in addition to principal and accrued finance charges, an attorney's fee of fifteen percent (15%) thereof."

Denlinger presents the following issues for our consideration:

1. Is the sole shareholder and president of a closely held corporation to be held personally liable for corporate obligations when he has signed a writing assuming personal responsibility?

2. Does Pennsylvania law require a separate signature in an "individual capacity" for a personal guarantee to be effective, even though the individual signing in a representative capacity has unequivocally agreed to be personally liable; and does Pennsylvania law require a contracting party to explain to another business person the effect of a personal guarantee?

3. Is a credit application a contract of adhesion; is demanding a personal guarantee from the sole shareholder of a closely held corporation unconscionable?

4. Is a personal guarantee of a sole shareholder supported by consideration when given with respect to credit extended to his closely held corporation?

5. Is a signature in a representative capacity sufficient to satisfy the statute of frauds applicable to guarantee agreements?

6. Are finance charges (or interest) and percentage attorney's fees collectible when agreed upon in writing?

In his cross-appeal Dendler asks us to determine whether the trial court erred in refusing to award him attorney's fees pursuant to section 2503(9) of the Judicial Code.

■ Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.C.P. 1035(b). Summary judgment should be granted only when the right is clear and free from doubt. *Musser v. Vilsmeier*, 522 Pa. 367, 369, 562 A.2d 279, 280 (1989).

In determining whether a summary judgment was properly granted, we must accept as true all properly pleaded facts, as well as all reasonable inferences that may be drawn therefrom. *Overly v. Kass*, 382 Pa.Super. 108, 111, 554 A.2d 970, 971 (1989). We must resolve all doubts regarding the existence of a genuine issue of material fact against the party moving for summary judgment. *Marks v. Tasman*, 527 Pa. 132, 133, 589 A.2d 205, 206 (1991). On appeal, we must examine the record in the light most favorable to the non-moving party, *id.*, and we will not reverse the trial court's order unless there has been an error of law or a manifest abuse of discretion. *Vargo v. Hunt*, 398 Pa.Super. 600, 601, 581 A.2d 625, 626 (1990).

About the time he formed Blue Mountain, Dendler discussed opening a credit account at Denlinger with one of Denlinger's salesmen, Robert Witmer. Witmer gave Dendler a blank credit application form. Several weeks later, Dendler returned the completed application to Witmer who then forwarded it to the credit manager, Robert Hamor. The credit application consists of an 8½ inch by 14 inch two-sided form which is used for corporations, partnerships or individual applicants. On the face of the form all printing is in upper case block letters one-eighth inch high. Beneath the Denlinger logo and address at the top center, the first line reads "name of applicant." Dendler inserted "Blue Mountain Development Co., Inc." in large capital letters. Dendler completed the "corporation" section and left blank the sections for individuals and partnerships. He also supplied the financial information requested on the face of the form. The reverse side of the form, which is captioned "Terms and Conditions" in bold letters, contains six individually numbered paragraphs, set off from one another by double spacing. Each paragraph outlines a separate term governing credit accounts at Denlinger. *See* n. 2 & 3, *supra*. The printing, in upper and lower case letters, is only marginally smaller than that on the face of the form. The lower half of the page contains designated areas for up to four separate parties to sign. Dendler signed "Blue

Mountain Development Corp., Inc. By Brad Dendler, Pres."
in proper corporate form on the appropriate lines.

■ Although Denlinger presents several issues for our
review, the outcome of both the appeal and the cross-appeal
hinge on our determination of whether the credit applica-
tion, particularly paragraph four, that Dendler submitted as
the basis for obtaining a credit account for Blue Mountain,
is void as against the public policy of the Commonwealth.
Paragraph four on the reverse side of the application form
provides: [4]

4. In consideration of the *credit* which has been or
which may in the future be *extended to Applicant*, the
*undersigned, if signing on behalf of a corporation*,
partnership or other entity, jointly and severally if more
than one, *hereby personally guarantee(s)* prompt and
*full payment of all accounts* now or hereafter *owing by
Applicant* to Denlinger, Inc. The *undersigned* further
agree(s) that the foregoing guarantee is continuing, abso-
lute and unconditional and *may be enforced against* any
of *the undersigned*, individually, jointly or in any combi-
nation, *without first proceeding against Applicant* and
waive(s) any right to be released by reason of any exten-
sion of time or change in terms of payment and any other
defense now or hereafter available, except the defense of
payment. (emphasis added).

In its opinion the trial court stated:

It is Defendant Dendler's contention that this language
[paragraph four] imposing personal liability on him is
unconscionable and should be stricken. This Court has
little problem in so construing such phraseology both as
an adjunct and extension to the public policy pronounce-

---

4. In his brief to this court, Dendler inaccurately reproduced this
critical paragraph. On the actual credit application, in paragraph
four and throughout the "Terms and Conditions," the word "Appli-
cant" is *consistently capitalized,* and we think, intentionally so. Al-
though ostensibly quoting from the credit application form, Dendler
nevertheless consistently replaces the upper case "A" with a lower case
"a," thereby changing the visual presentation, which in this case, is of
some import.

ment in *Galligan v. Arovitch*, 421 Pa. 301, 219 A.2d 463 (1963), wherein our Supreme Court condemned the exculpatory clause of a residential form lease and also under general contract principles.

We cannot agree. *Galligan* is inapposite to this case. In *Galligan*, the plaintiff/tenant had been injured on the lawn of defendant/lessor's apartment building. The standard form lease tenant had signed contained a lengthy exculpatory clause which listed, among other things, seven places from which the lessor was relieved of liability for injury or damage. Although hallways and sidewalks were listed exclusions, lawns were not. Thus, following the rule that any document which reduces legal rights that would otherwise exist must spell out "with the utmost particularity" the intention of the parties, *Morton v. Ambridge Borough*, 375 Pa. 630, 635, 101 A.2d 661, 663 (1954), and the rule of construction that a written instrument is to be strictly construed against the maker, *Darrow v. Keystone*, 365 Pa. 123, 74 A.2d 176 (1950), our supreme court found the ·xculpatory clause did not protect the lessor in that particular case. *Galligan*, 421 Pa. at 304, 219 A.2d at 465.

In concluding the opinion for the court, Mr. Justice Cohen added: "[t]here are, however, policy considerations which, *though not necessary to this decision, are the writer's personal observation and do bear some relevance." Id.* Justice Cohen then commented that the exculpatory clause is to be found in *every* form lease and,

understandably enough, landlords are unwilling to strike therefrom that provision which strongly favors them. *Thus it is fruitless* for the prospective tenant of an apartment to seek a lease having no exculpatory clause. The result is that *the tenant has no bargaining power and must accept his landlord's terms.* There is no meeting of the minds, and the agreement is in effect a mere contract of adhesion, whereby the tenant simply adheres to *a document which he is powerless to alter,* having *no alternative* other than to reject the transaction entirely. (emphasis added).

*Id.* In light of the trial court's reliance on Justice Cohen's comments, we are compelled to reiterate Justice Cohen's own observation that his remarks are *obiter dicta.* It is well established that general expressions in an opinion "must be considered in the light of and cannot be dissevered from the facts of that case; what is actually decided and controlling is the law applicable to the particular facts of that particular case and while all other statements and conclusions therein are entitled to great consideration *they are not controlling."* *In Re Estate of Mary C. Pew,* 411 Pa. 96, 104–105, 191 A.2d 399, 404 (1963); *see also In Re Estate of Cassell,* 334 Pa. 381, 6 A.2d 60 (1939). Nevertheless, we will address the concerns voiced by Justice Cohen and the trial court.

Initially we note that, unlike the case at hand, the plaintiff in *Galligan* was a consumer, an individual seeking an apartment to rent. The defendant, however, was an experienced businessman, operating an apartment building as a commercial venture. There was a great disparity in their business acumen as well as in their bargaining power. A prospective tenant like Galligan, although displeased with the objectionable clause in the lease, had no alternative but to sign the lease if he wanted to rent an apartment. As virtually every landlord in the area used the same standard form lease, it was futile to seek a lease without such an exculpatory clause. According to Justice Cohen, the prospective tenant had only two alternatives: sign the lease with the objectionable clause, or reject the lease altogether. *Galligan, supra.* This court's statement in *Germantown Manufacturing Company v. Rawlinson,* 341 Pa.Super. 42, 56, 491 A.2d 138, 145 (1985), that "[t]the need for application of this standard [unconscionability] is most acute when the professional seller is seeking the trade of those most subject to exploitation—the uneducated, the inexperienced and the people of low incomes" aptly describes the situation which prompted Justice Cohen's comments in *Galligan.*

Conversely, here neither party is a consumer. Both Den-

dler, as president and sole shareholder [5] of Blue Mountain, and Denlinger, are commercial enterprises. Both are corporations. Although Dendler repeatedly points out that he is only a high school graduate, he is, nonetheless, an experienced businessman. For at least six years prior to forming Blue Mountain, Dendler worked in the building and construction trade as a sole proprietorship. According to the credit application, he was seeking a twenty to thirty thousand dollar line of credit. Dendler was engaged in building residences that sold for approximately a quarter of a million dollars. Unlike *Galligan,* in which a prospective renter was powerless against the landlords of the region who all used the same standardized lease, here the monolithic unity of the landlords and the coercive atmosphere inherent in a lack of alternatives are absent. In *Galligan,* the plaintiff was seeking a necessity—a place to live—while Dendler was merely seeking a more convenient method of paying corporate bills. Consequently, under the circumstances of this case, the trial court's concern about unequal bargaining power and overreaching is misplaced. Moreover, "it would be improper to borrow, without differentiation, concepts developed to protect consumers and employ them in favor of one commercial party over another." *Stanley A. Klopp, Inc. v. John Deere Co.,* 510 F.Supp. 807 (E.D.Pa.1981), *affirmed* 676 F.2d 688 (3rd Cir.1982).

Dendler's principal argument is that Denlinger's credit application is an adhesion contract and is also unconscionable. This contention lacks merit. An adhesion contract, according to Black's Law Dictionary (5th ed. 1979), is a

[s]tandardized contract form offered to consumers of goods and services on essentially "take it or leave it"

5. Throughout its brief Denlinger refers to Dendler as the "sole share-holder" of Blue Mountain, and whenever possible, gratuitously mentions that fact. However, Denlinger's focus is misplaced, for it is well established in the Commonwealth that a corporation is to be regarded as an independent entity, even if its stock is owned entirely by one person. *See College Watercolor Group, Inc. v. William H. Newbauer, Inc.,* 468 Pa. 103, 360 A.2d 200 (1976).

basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract. Distinctive feature of adhesion contract is that weaker party has no realistic choice as to its terms.... Not every such contract is unconscionable. (citations omitted)

Insurance contracts, for example, are generally considered contracts of adhesion because the parties are not of equal bargaining power and the consumer, should he want to obtain insurance, is forced to accept the non-negotiable terms of a standard form contract. *Bishop v. Washington,* 331 Pa.Super. 387, 400, 480 A.2d 1088, 1094 (1984) (citations omitted). However, not every form contract can be termed a contract of adhesion. Whether a contract is, in fact, an adhesion contract must be determined on an individual basis, in light of the particular circumstances and parties involved. *Commonwealth of Pennsylvania v. Monumental Properties, Inc.,* 10 Pa.Cmwlth. 596, 609, 314 A.2d 333, 339 (1973). As our supreme court has noted, leases containing exculpatory clauses which could be considered contracts of adhesion will not be so termed when the parties involved are corporations with equal bargaining power. *See Employer's Liability Assurance Corp., Ltd. v. Greenville Business Men's Assoc.,* 423 Pa. 288, 224 A.2d 620 (1966).

The doctrine of unconscionability is both a statutory [6] and a common law defense to the enforcement of an allegedly unfair contract or provision in a contract. *Wagner v. Estate of Rummel,* 391 Pa.Super. 555, 561, 571 A.2d 1055, 1058 (1990), *allocatur denied* 527 Pa. 588, 588 A.2d 510 (1991); *Germantown Manufacturing,* 341 Pa.Super. at 55, 491 A.2d at 145. Although the party challenging the contract or provision bears the burden of affirmatively pleading and proving the unconscionability, *Bishop,* 331 Pa.Super. at 399, 480 A.2d at 1094 (citations omitted), the

**6.** Unconscionability in contracts involving goods and services under the purview of the Uniform Commercial Code is policed by 13 Pa. C.S.A. § 2302, entitled "Unconscionable contract or clause."

actual determination of unconscionability is a question of law for the court. *Id.; Klopp, supra; see also* 13 Pa.C.S.A. § 2302. Once a contract is deemed to be one of adhesion, its terms must be analyzed to determine whether the contract as a whole, or specific provisions of it, are unconscionable. *Bishop,* 331 Pa.Super. at 387, 480 A.2d at 1088. It is important to note, however, that our supreme court, and the federal courts of Pennsylvania, have "refused to hold contracts unconscionable simply because of a disparity in bargaining power." *Witmer v. Exxon Corporation,* 495 Pa. 540, 551, 434 A.2d 1222, 1228 (1981) (citations omitted); *Koval v. Liberty Mutual Insurance Company,* 366 Pa.Super. 415, 423, 531 A.2d 487, 491 (1987), *allocatur denied* 518 Pa. 619, 541 A.2d 746 (1988); *Klopp, supra.*

■ In support of his contention that the credit application is an adhesion contract, Dendler cites salesman Witmer's deposition testimony in which he stated that generally Denlinger did not permit modifications of the terms of the application, and if asked to modify the application, the employees would say no. However, Witmer also stated that *he had seen applications where some of the terms had been crossed out.* When asked which terms had been deleted, Witmer responded: "I've seen some builders put lines through some of these but I couldn't tell you which one. I just—I generally just turn them in in any respect that I'm given them and then it's up to our officers as to whether or not they will accept them that way." Similarly, when the credit manager[7] of Denlinger, Robert Hamor, was asked in his deposition if the company would permit an applicant to delete any of the paragraphs on the reverse of the form he replied, "Only under certain conditions we do." Hamor further elaborated that "we review any application that has been altered, with altered terms, and generally we require additional financial information. We then make a further judgment of that application based on that addition-

7. According to Hamor's deposition testimony, the credit committee, which made all decisions regarding the extension of credit, consisted of Robert Hamor, the credit manager, and John Denlinger, an owner of Denlinger, Inc.

al financial information." When asked whether Denlinger had ever deleted the personal guarantee provision in any of the applications, Hamor responded, "Yes." When queried as to when, Hamor responded, "I don't know specifically. We have done so."

In light of the deposition testimony of Witmer and Hamor, it cannot be said that a credit applicant "has no bargaining power and must accept [Denlinger's] terms." *Galligan, supra.* Unlike the tenant described by Justice Cohen, a Denlinger credit applicant is not forced to sign "a document which he is powerless to alter." *Id.* Dendler does not allege that he was forced to acquiesce in the form credit application in order to obtain the building supplies he needed. *Bishop, supra; Overly, supra.* As the deposition testimony of Witmer and Hamor reveals, in dealing with Denlinger, it is *not* "fruitless" to seek to have objectionable clauses deleted or modified. *Galligan supra.* Therefore, we conclude that the Denlinger credit application is not a contract of adhesion.

 Dendler next contends that the credit application is unconscionable. We do not agree. The test of unconscionability, as mandated by our supreme court, is twofold. First, for a contract or a term to be unconscionable, the party signing the contract must have lacked a meaningful choice in accepting the challenged provision. Second, the challenged provision must "unreasonably favor" the party asserting it. *Witmer v. Exxon Corp.,* 495 Pa. 540, 551, 434 A.2d 1222, 1228 (1981); *Koval, supra; see also Beckman v. Vassall–Dillworth, Etc.,* 321 Pa.Super. 428, 468 A.2d 784 (1983). Dendler has failed to meet his burden in establishing that, as the party signing the contract, he lacked a meaningful choice in accepting paragraph four of the credit application.

In his deposition testimony Dendler admitted he did not attempt to negotiate or change any terms of the credit application. Dendler also admitted no Denlinger employee ever told him the terms were non-negotiable, or that it was futile to even ask about modifying the terms and conditions

on the application. Moreover, Denlinger is not an exclusive supplier of rare or much-sought-after goods, a situation which could induce one to "adhere" to an unfavorable contract, *Galligan, supra,* and thereby reduce meaningful choice. *Witmer, supra.* Denlinger sells building materials and construction supplies which are readily available from a variety of sources. If Dendler found the terms of Denlinger's credit application onerous, he was at liberty to seek a credit account elsewhere. Dendler has not alleged that there are no other lumberyards within traveling distance. *Overly, supra.* Nor has Dendler alleged that it would have been futile to seek a credit account elsewhere because the other area supply sources utilized the same standardized credit application. *Overly, supra; Galligan, supra.* In addition, Dendler was free to obtain his supplies from Denlinger on a cash-only basis, as he had when he operated as a sole proprietorship. As this court recently stated, "where, as here, a contract provision affects commercial entities with meaningful choices at their disposal, the clause in question will rarely be deemed unconscionable." *Vasilis v. Bell of Pennsylvania,* 409 Pa.Super. 396, 399, 598 A.2d 52, 54 (1991); *see also Klopp, supra* (noting a number of courts have recognized that, although it is possible, rarely will a commercial contract or term be found to be unconscionable.) As Dendler is unable to meet the first requirement of our supreme court's two-part test, we cannot conclude Denlinger's credit application is unconscionable.

Dendler insists that his failure to complete the "individual" section of the credit application attests to the fact that he never intended to be personally liable for the unpaid debts of Blue Mountain. Dendler's assertion strains credulity. The credit application is a multi-purpose form used by corporate, partnership and individual applicants alike. Each applicant is to furnish the information requested in the section reflective of its legal status. After listing Blue Mountain Development Corporation, Inc. as the applicant on the credit application, Dendler was correct in completing the "corporation" section of the form and leaving unanswered

the questions posed by the inapplicable "partnership" and "individual" sections. By doing so Dendler merely reinforced that the applicant, Blue Mountain, was a corporation, and not a partnership or individual. There is simply nothing more that can be legitimately inferred from Dendler's completion of the "corporation" section on the face of the credit application. This is especially true in light of the clear language of paragraph four of the application, which is directly applicable to an individual signing on behalf of a corporation.

■■■ Similarly, Dendler argues that because he was applying for credit in the corporate name and he signed the credit application only as an official of the corporation, he never understood he was binding himself personally for Blue Mountain's debts. This argument lacks merit. In *Beckman, supra,* this court was faced with an analogous situation. In *Beckman,* the appellant argued that when he was given the disputed insurance contract to sign he was never told or made aware of the "no-agency" clause on the reverse side of the contract. Therefore, the appellant argued, not only was the clause unconscionable, but the contract itself was a contract of adhesion. This court stated then, as we do again now, that although a party "may not have been 'told or made aware' of the print on the back side of the agreement, he nevertheless admitted in a deposition that he had read the whole contract before signing it." *Beckman,* 321 Pa.Super. at 437, 468 A.2d at 788. Here, as in *Beckman,* "the record showed that he was an experienced businessman, equipped to understand the meaning of the terms of the agreement he signed." *Id.,* 321 Pa.Superior Ct. at 438, 468 A.2d at 789. Consequently, in the absence of allegations of fraud or mutual mistake [8] to

8. "Generally, if a mistake is not *mutual,* but *unilateral,* and is not due to the fault of the one not mistaken, there is no basis for relief." *Warren v. Greenfield,* 407 Pa.Super. 600, 609, 595 A.2d 1308, 1312 (1991), *citing McFadden v. American Oil Company,* 215 Pa.Super. 44, 257 A.2d 283 (1969) (emphasis in original).

explain the presence of paragraph four in the the credit application, Dendler is bound by his signature.[9] *Id.*

Dendler "was legally bound to know the terms of the contract in which he himself engaged." *Montgomery v. Levy,* 406 Pa. 547, 550, 177 A.2d 448, 450 (1962). Moreover, "[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains. (citations omitted) *Ignorantia non excusat." Simeone v. Simeone,* 525 Pa. 392, 400, 581 A.2d 162, 165 (1990) (emphasis in original). In his deposition testimony Dendler admitted that he had read the credit application. He also admitted that he had discussed certain terms and conditions on the application with Witmer, and that Witmer had answered everything he had asked. Dendler admitted that he had never asked Witmer about paragraph four, and that he had never sought an attorney's advice about it. Dendler had the credit application in his possession for thirty to forty days before he returned it to Denlinger. Dendler had ample time in which to consult with an attorney, or anyone else of his choice, as to the meaning and legal effect of the "Terms and Conditions" on the the credit application.[10]

Our supreme court has stated that:

9. In *Estate of Brandt,* 463 Pa. 230, 235, 344 A.2d 806, 809 (1975), our supreme court reiterated that "this Court has repeatedly held that in the absence of proof of fraud 'failure to read is an unavailing excuse or defense and cannot justify avoidance, modification or nullification of the contract or any provision thereof,'" *quoting Olson Estate,* 447 Pa. 483, 488, 291 A.2d 95, 98 (1972). Here, as no allegations of fraud appear in the record, we find no grounds for "avoidance, modification or nullification" of paragraph four. *Id.*

10. In *McKee v. Moon,* 400 Pa.Super. 161, 583 A.2d 5 (1990), Moon, the president of a corporation, signed a contract to have work performed for the corporation. Like Dendler, Moon signed the contract in his capacity as a corporate officer only; he did not sign as an individual. Paragraph five of the contract provided:

The person executing this Agreement on behalf of the Client represents that he or she has full authority to do so and guarantees the payment by Client to Agent of all the fees and expenses described above. The parties further agree that this Agreement shall not be

A person of age is presumed to know the meaning of words in a contract, and *if, relying upon his own ability, he enters into an agreement not to his best interests he cannot later be heard to complain* that he was not acquainted with its contents and *did not understand the meaning of the words* used in the instrument which he signed. (citations omitted) (emphasis added).

*Schoble v. Schoble*, 349 Pa. 408, 411–412, 37 A.2d 604, 605 (1944). "It is well established that one having the capacity to understand a written document ... who signs it, is bound by his signature." 13 Williston on Contracts, § 1577 (3rd ed. 1970). Moreover, "[where a signer] has *made himself acquainted with the words of the document and his mistake concerns its interpretation or legal effect,* his unilateral error affords no more grounds for relief than does ignorance of the words." *Id.* (emphasis added).

The "Terms and Conditions" on the reverse side of the credit application are written in clear and distinct type. Each paragraph is separately numbered and distinctly set off from each other. The entire section is comprised of only six short paragraphs. The terms are written in plain English. The term "Applicant" is always capitalized, which draws attention to it. There is no technical terminology, no attempt to bury significant information in bewildering ver-

altered or amended without the written consent of both parties thereto.

Unlike Dendler, in *McKee,* Moon's attorney had explained the contract to him "paragraph by paragraph and word for word," *id.,* 400 Pa.Superior Ct. at 162, 583 A.2d at 6, before Moon signed it, to ensure that Moon fully understood the potential consequences of his personal guarantee. This court found Moon's argument that he signed the contract in the corporate name only unconvincing; the panel affirmed the trial court order enforcing the contract against Moon.

Paragraph four of the Denlinger credit application outlines the personal guarantee imparted by a corporate signature in much more explicit and understandable terms than paragraph five of the contract in *McKee.* Nevertheless, we choose not to decide this case on the basis of *McKee.* In *McKee,* Moon's attorney had thoroughly explained the consequences of paragraph five to him. Although Dendler could have availed himself of legal counsel, he failed to do so. We find Dendler's lack of legal counsel to be sufficiently distinguishable to preclude reliance on *McKee.*

biage. "The agreement in question is not couched in such fineness of terminology that appellee can successfully contend that he could not understand the meaning of the written words." *Schoble*, 349 Pa. at 411, 37 A.2d at 605. In addition,

> [t]he law demands of every man who bargains with another that he should do so only after due reflection of the possible consequences of his bargain and if he misjudges the consequences that could have been expected by a reasonably intelligent man, he cannot rely on the law to remedy his fecklessness.

*New Charter Coal Company v. McKee*, 411 Pa. 307, 312, 191 A.2d 830, 833 (1963). Paragraph four is clearly worded and conspicuously displayed. Dendler, therefore, cannot avoid the consequences of that paragraph by attempting to prove that he did not understand it. *Standard Venetian Blind Company v. American Empire Insurance Company*, 503 Pa. 300, 307, 469 A.2d 563, 567 (1983) (citations omitted).

Accepting as true all properly pleaded facts and all inferences that can reasonably be drawn therefrom, *Overly, supra,* and examining the record in the light most favorable to Denlinger as the non-moving party, *Marks, supra,* we conclude that the Denlinger credit application is not a contract of adhesion and that paragraph four of the "Terms and Conditions" is not unconscionable and void as against the public policy of the Commonwealth. We find that the trial court committed an error of law and, therefore, we reverse the trial court's order granting summary judgment to Dendler. *Vargo, supra.* We affirm the order denying Dendler attorney's fees. As we have already determined that summary judgment was improvidently granted, we need not reach the other issues presented in this appeal.

Order granting summary judgment reversed; order denying attorney's fees affirmed: case remanded for trial on the issues.

Jurisdiction relinquished.

DEL SOLE, J., files a dissenting opinion.

## ADDENDUM
## TERMS AND CONDITIONS *

In addition to the terms and conditions set forth in any subsequently executed sales agreement or similar document, all purchases made by Applicant shall be subject to the following terms and conditions:

1. Denlinger, Inc. reserves complete discretion concerning all extensions of credit and shall have the right at any time to refuse to extend credit to Applicant.

2. Denlinger, Inc. warrants that all materials sold by it, other than materials subject to a manufacturer's warranty, shall at the time of delivery be free of defects in material and workmanship. Applicant shall notify Denlinger, Inc. of any defect within 24 hours following delivery and any claim for breach of warranty not made within that time shall be deemed to have been waived. Provided that timely notice of defect is given, Denlinger, Inc. will repair or replace any defective materials or, at its option, refund the purchase price of such materials. No warranty is made by Denlinger, Inc. In connection with materials subject to a manufacturer's warranty and any claim relating to such materials shall lie exclusively against the manufacturer. The foregoing shall be exclusive remedies of Applicant as to all materials sold by Denlinger, Inc. and Denlinger, Inc. shall not, under any circumstances, be liable to Applicant or to any other person for lost profits, additional expenses incurred in replacing defective materials, or any other special, incidental, indirect or consequential losses or damages of any kind whatsoever. Except for the foregoing express warranty and any applicable manufacturer's warranty, no WARRANTY OF MERCHANTABILITY or WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, or any other warranty, express, statutory or implied shall apply to any materials sold by Denlinger, Inc.

3. Applicant acknowledges and agrees that all purchases made by it shall be paid for in accordance with such payment terms as may from time to time be established by Denlinger, Inc. Until otherwise notified by Denlinger, Inc., the following payment terms shall apply: (i) all accounts will be billed as of the 25th day of each month, (ii) a discount of two percent (2%) on any invoice, exclusive of delivery charges, will be allowed for payments which are received on or before the tenth day of the month following the month of billing, (iii) the net amount of each invoice is due on or before the 25th day of the month following the month of billing, (iv) any invoice not paid in full by the 25th day of the month following the month of billing will be subject to a finance charge of up to two percent (2%) per month, and (v) balances under $25.00 will be subject to a minimum finance charge of $0.50 per month.

4. In consideration of the credit which has been or which may in the future be extended to Applicant, the undersigned if signing on behalf of a corporation, partnership or other entity, jointly and severally if more than one, hereby personally guarantee(s) the prompt and full payment of all amounts now or hereafter owing by Applicant to Denlinger, Inc. The undersigned further agree(s) that the foregoing guarantee is continuing, absolute and unconditional and may be enforced against any of the undersigned, individually, jointly or in any combination, without first proceeding against Applicant and waive(s) any right to be released by reason of any extension of time or change in terms of payment and any other defense now or hereafter available, except the defense of payment.

5. In the event that Applicant's account is referred to an attorney for collection, Applicant agrees that Denlinger, Inc. shall be entitled to collect, in addition to principal and accrued finance charges, an attorney's fee of fifteen percent (15%) thereof. This Credit Application and any subsequent contract of sale between Denlinger, Inc. and Applicant shall be deemed to have been entered into at the home office of Denlinger, Inc. in Paradise, Pennsylvania and the Applicant and the undersigned hereby consent to the exercise of jurisdiction by the courts of the Commonwealth of Pennsylvania and further agree that venue shall lie exclusively in the Court of Common Pleas of Lancaster County in the event that any suit is instituted by Denlinger, Inc. in connection with any cause of action arising from or relating to this Credit Application or any extension of credit hereunder.

6. This Credit Application shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

APPLICANT: _X BLUE MOUNTAIN DEVELOPMENT CO INC._

By: _____ (SEAL)

Relationship
to Applicant: _____

---

DEL SOLE, Judge, dissenting.

I must dissent from the Majority's opinion, and would affirm the trial court's order granting summary judgment in favor of Appellee.

In the instant case, the applicant for credit from Denlinger was Blue Mountain Development Co., Inc. As the majority notes, Mr. Dendler had recently incorporated his small, sole proprietorship construction business, and we may as-

* The addendum has been reduced for publication purposes.

sume that one of the reasons for forming such a corporation was to benefit from the limited liability afforded corporations in this Commonwealth. As we stated in *Village at Camelback Property Owners' Association Inc. v. Carr*, 371 Pa.Super. 452, 458, 538 A.2d 528, *appeal granted* 519 Pa. 668, 548 A.2d 257 (1988), *affirmed* 524 Pa. 330, 572 A.2d 1 (1990);

> [O]ne of the central reasons for conducting business in corporate form is the avoidance of personal liability by those holding equity in the corporation and limitation of the risk of those persons to the value of their equity ... [B]ecause of this goal, our Business Corporations Law permits liability for corporate debt to be assessed against shareholders, officers and directors in only the most limited of circumstances.

It is also the settled law of this Commonwealth that a corporation is a creature of legal fiction which can act only through its officers, directors and other agents, *Lokay v. Lehigh Valley Cooperative Farmers, Inc.*, 342 Pa.Super. 89, 97, 492 A.2d 405, 408 (1985), and that when, "a party contracts with a corporation through a corporate agent who acts within the scope of his authority and reveals his principal, the corporate principal alone is liable for breach of contract." *Daniel Adams Associates, Inc., v. Rimbach Publishing, Inc.*, 360 Pa.Super. 72, 519 A.2d 997, 1000–1001 (1987). Therefore when a corporation contracts with another company for credit through its officer, and the officer acts within the scope of that authority and reveals the corporate principal, it is reasonable to expect that the corporate principal alone and not the officer/signatory will be liable if there is a breach of contract.

It is undisputed that the credit application was signed by Mr. Dendler in his corporate capacity as president of Blue Mountain, and there was no separate signature of Mr. Dendler's in his individual capacity. He was acting within the scope of his authority and revealed the identity of his principal. Furthermore, the named applicant was Blue Mountain Development Co., Inc., and Mr. Dendler filled in

the application in the space provided for a corporate applicant, rather than in the other spaces provided for a partnership or an individual. Therefore, Mr. Dendler intended to bind the corporation, not himself, personally, and because a central benefit of incorporating was to avoid personal liability, he reasonably expected that in signing the application in his corporate capacity, he was binding the corporation and was not incurring personal liability.

The majority correctly sets forth a test regarding unconscionability as found in *Witmer v. Exxon Corp.*, 495 Pa. 540, 541, 434 A.2d 1222 (1981). Later cases of this court, however, have expanded and explained this test to apply to a variety of circumstances, some of which are particularly relevant to the case before us.

In *Germantown Manufacturing Co. v. Rawlinson*, 341 Pa.Super. 42, 491 A.2d 138, 146–47 (1985), we discussed one type of unconscionability which may be classified under the rubric of "unfair surprise".

This type of unconscionability involves contractual terms which are not typically expected by the party who is being asked to "assent" to them. An unexpected clause often appears in the boilerplate of a printed form and, if read at all, is often not understood. By signing such a form, a party is bound only to those terms which such party would reasonably expect such a printed form to contain. If the form contains a material, risk shifting clause which the signer would not reasonably expect to encounter in such a transaction, courts have held that the clause may be excised as it is unconscionable. This type of unconscionability is typically found only in consumer cases and courts have exhibited some reluctance to apply it in cases dealing with merchant-to-merchant contracts. A court must determine what a particular party, in the context of the particular transaction, reasonably expected beyond the "dickered" terms. Unread terms in the form that are consistent with that expectation should be operative: those that are inconsistent should be inoperative. The conspicuousness of the print as well as the character

of the document would be considered. J. Murray, *The Standardized Agreement Phenomenon in the Restatement (Second) of Contracts*, 67 Cornell L.Rev. 735, 776 (1982).

In the instant case, Mr. Dendler could not reasonably expect that there would be a clause in the boilerplate of the printed form which would hold him personally liable for the debts of the corporation. He had signed the document in his corporate capacity and had applied for credit for the corporation in the space on the form provided for corporations, not in the space provided for individuals. Furthermore, there is no question that the clause in dispute is a material, risk-shifting clause. It completely negates the value of a corporation's limited liability, and shifts the risk of default onto the officer who is acting for the corporation.

The disputed clause found in the document is part of the boilerplate language found on the back of the form. There is no bolding or underlining or variation in the typeface which distinguishes this clause from the rest of the small print on the back of the form, although, in contrast on the back, the part of the form which limits warranties is capitalized and printed in darker, thicker print. In general, this clause is a classic example of a physically inconspicuous provision in the boilerplate of a standard form.

Finally, in finding unconscionability we are asked to consider the character of the document. The document in question, a credit application form, is divided into sections applicable to various types of applicants: partnerships, corporations, and individuals. Therefore, we may characterize the document as a credit application form for corporations, or partnerships, or individuals. In filling out the section for corporations, it may be fairly said that Mr. Dendler was filling out a corporate credit application, and therefore a clause forfeiting the corporation's limited liability may be said to be inconsistent with the character of the document.

For all these reasons, I would find that the clause in the form, holding Mr. Dendler personally liable for the debts of

the corporation, is inoperative and falls under the category of unconscionability by unfair surprise.

The *Germantown* case, which sets out the standard for finding unconscionability by unfair surprise, is a consumer case and the question of whether merchant-to-merchant transactions may be unconscionable was not in issue. However, the Court did note that, "modern courts recognize that the signer may be theoretically and technically a merchant but functionally a consumer in terms of education, business acumen, and experience." *Germantown, supra,* 341 Pa.Superior Ct. at 57, 491 A.2d at 146, n. 5. More importantly, in a recent case, *Moscatiello v. Pittsburgh Contractors Equipment Company,* 407 Pa.Super. 363, 595 A.2d 1190 (1991), we found unconscionability in a contract between merchants.

In *Moscatiello,* we held that clauses in a sales contract signed by Franco Moscatiello, as owner of a construction company and Pittsburgh Contractors Equipment Company [PCEC], which excluded consequential and incidental damages, and limited Moscatiello's remedies to the return of the purchase price less wear and use of machine, was unconscionable and unenforceable because of the, "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Id.,* 407 Pa.Superior Ct. at 373, 595 A.2d at 1195, *quoting, Germantown, supra,* 341 Pa.Superior Ct. at 55, 491 A.2d at 145.

The *Moscatiello* court cited the following language contained in Section 353 of J. Murray, *Murray on Contracts,* (2nd ed., 1974).

The parties will not be found to have agreed to an abnormal allocation of risk if the only evidence thereof is an inconspicuous provision on the boilerplate of a standard form. At a minimum, the reallocation must be physically manifested in a fashion comprehensible to the party against whom it is sought to be enforced. *Id.*

We held that Moscatiello had no reason to expect that the contract he signed contained a clause that was buried in the fine print on the reverse side which shifted to him the risk of economic loss resulting from the purchase of the ma-

chine. We also held that Moscatiello was not a dealer or manufacture of heavy equipment of any kind, nor was the Moscatiello corporation a substantial business concern, skilled in the negotiation of contracts for goods. In contrast, PCEC had negotiated many other contracts for the purchase of this type of equipment and was familiar with the "conditions" on the reverse side of its own form. We also concluded that PCEC clearly held the superior bargaining position. *Id.*, 407 Pa.Superior Ct. at 376, 595 A.2d at 1196–1197. Therefore, this court found that Moscatiello, was "functionally a consumer in terms of education, business acumen and experience," and the terms of the contract limiting damages from the malfunctioning of the machine were unreasonable and unconscionable. *Id.*

Like Moscatiello Co., Blue Mountain Development Co. was not a substantial business concern, in fact it was probably smaller than Moscatiello which was engaged in highway construction projects, while Blue Mountain was a small construction business which specialized in residential projects and had just recently incorporated. It was not skilled in credit purchases, for as the Majority notes, prior to incorporation it dealt only in cash purchases of building materials from Denlinger. Denlinger, on the other hand, is a dealer in construction supplies, with many salespeople, a credit department, and wide experience in extending credit to its buyers. Clearly there was a vast disparity between the two parties in terms of bargaining power and sophistication in conducting this type of business, and therefore even though both parties were merchants, for the purposes of this contract, I would find that Mr. Dendler was functionally a consumer.

Furthermore, like the form contract in *Moscatiello*, the disputed clauses were buried in the fine print on the reverse side of the application, and the clause materially shifted the risk of economic loss away from the corporation, and to the individual acting for the corporation. Therefore, like the court in *Moscatiello*, I would find that the clause in which

Mr. Dendler assumed personal liability for the corporation's debts, unenforceable and unconscionable.

I am in full agreement with the trial court which stated: "Where someone is to be held personally liable for the debt of another, albeit a corporate obligation, that intent should be indicated in the most unequivocal and explicit language and *especially by a separate signature* in an individual capacity acknowledging such responsibility. Plaintiff in the present case is attempting to thwart the primary reason for incorporation of many small businesses—the avoidance of personal liability. While we are not here formulating a complete ban on such action, we are vigorously endorsing the principle that this will not be permitted except under the clearest circumstances and in the most unambiguous terms. (Trial Court Opinion at 4, May 20, 1991. (emphasis in original)).