**Mannion v. Manor Care Inc.**

*Andrew K. Mitnick,* for plaintiff.
*John M. Skrocki,* for defendants.

BLACK, *J.,* September 26, 2006—This case arises from the death of Marian L. Flueso while a resident at a nursing home facility owned and operated by one or more of the corporate defendants (Manor Care).[1] The individual defendant, E. Thomas Scarborough III, was the administrator of the facility. The decedent's daughter, Edith Mannion, as administratrix of her estate, has com-

---

1. The complaint also named Ancillary Services Management Inc., as a co-defendant. However, the complaint has been dismissed as to this defendant for lack of prosecution.

menced this action to recover money damages on behalf of the estate and on her own behalf and under the Wrongful Death and Survival Acts, 42 Pa.C.S. §§8301, 8302. The complaint alleges the decedent suffered personal injuries and death as a result of negligence on the part of the defendants.

Before the court are the defendants' preliminary objections to the complaint. The first objection is that the parties' dispute must be submitted to arbitration in accordance with the rules of the American Arbitration Association (AAA), pursuant to the arbitration and limitation of liability agreement signed by Ms. Mannion at the time of her mother's admission into Manor Care. This court granted the parties additional time to conduct discovery and to submit depositions and supplemental briefs on this issue. After reviewing the depositions and briefs, we have concluded, for the reasons stated below, that this preliminary objection must be sustained and the parties' dispute submitted to arbitration.

The defendants have also moved to strike scandalous and impertinent matter as well as the request for punitive damages. Because of our decision on the arbitration issue, these objections are moot.

## FACTS

The pertinent facts, based on the depositions and documents submitted,[2] are as follows: The Manor Care

---

2. The evidence submitted consisted of the depositions of Ms. Mannion and of Louise DeFranco, the admission director for Manor Care, along with the arbitration and limitation of liability agreement executed by Ms. Mannion, a fax cover sheet from Ms. DeFranco to Ms.

entities are engaged in the ownership and operation of nursing homes and assisted living facilities. On or about January 13, 2004, Ms. Flueso was admitted to the nursing home facility operated by Manor Care at 1265 Cedar Crest Boulevard, Allentown, Lehigh County, Pennsylvania. Ms. Flueso was transferred to the facility from Sacred Heart Hospital, where she had been a patient. At the time of the transfer Ms. Flueso was in a confused state. Her daughter, Edith Mannion, held a power of attorney authorizing her to act on Ms. Flueso's behalf.

Ms. Mannion made the decision to transfer her mother to Manor Care. She was under great pressure to move her mother from the hospital to a skilled nursing facility very promptly. It was a very upsetting experience for her. Only two nursing facilities in the area were within driving distance for her mother's boyfriend. One of these facilities, however, had a two-year waiting list for new residents. As a result, Ms. Mannion considered Manor Care to be the only suitable option.

She spoke by telephone with Louise DeFranco, the admission director at Manor Care, about the paperwork required for admission. Ms. DeFranco briefly reviewed the documents that would be required and agreed to fax them to Ms. Mannion for her signature. When Ms. Mannion received the faxed paperwork, consisting of 21

---

Mannion, several pages of medical records of Sacred Heart Hospital pertaining to Ms. Flueso; a social service progress note of Manor Care pertaining to Ms. Flueso, various training materials provided by Manor Care to Ms. DeFranco regarding arbitration agreements, and an attestation form completed by Ms. DeFranco in connection with Ms. Flueso's admission.

pages, she did not have time to read all the documents carefully before signing them and sending them back. Her state of mind at that time was a "blur."[3]

The documents were all preprinted. They were standard form documents prepared by Manor Care for signature by new residents. Ms. Mannion was aware that the paperwork included an agreement to arbitrate, but she did not understand that this would preclude her from pursuing a claim in court. Ms. DeFranco never explained the arbitration agreement to her. Nor did Ms. DeFranco inform Ms. Mannion that she could make changes in any of the documents.

On January 13, 2004, Ms. Mannion executed and returned the documents that had been faxed over by Ms. DeFranco for her mother's admission into Manor Care.[4] One of these documents was a six-page agreement entitled "Arbitration and limitation of liability agreement." The agreement provides in section A for alternative dispute resolution in the event of controversies or claims arising out of or relating to Ms. Flueso's stay and care at the Manor Care facility. Thus, in section A.1.1 the agreement states the following:

"(1.1) Any and all claims or controversies between the facility and the resident arising out of or in any way related or connected to the resident's stay and care at the facility, including, but not limited to, disputes regarding

---

3. Deposition of Edith Mannion, 5/4/2006, 42.

4. Ms. Flueso also signed a copy of the admission documents, including the agreement. However, she suffered from confusion when the paperwork was completed. For this reason, her daughter also executed the documents on her behalf.

alleged personal injury to the resident caused by improper or inadequate care, allegations of medical malpractice, and interpretation of this agreement, whether arising out of state or federal law, and whether based upon statutory duties, breach of contract, tort theories or other legal theories under Pennsylvania law, including provisions relating to the resident's rights under Pennsylvania law, or a claim for unpaid nursing home or related charges, shall be submitted to final and binding arbitration. Except as expressly set forth herein, the provisions of the Pennsylvania Uniform Arbitration Act, 42 Pa.C.S. §7301 et seq., shall govern the arbitration. Each party hereby waives its right to file a court action for any matter covered by this agreement."

Under the agreement discovery is governed by the Pennsylvania Rules of Civil Procedure, but is limited to the sharing of certain enumerated materials.[5] The resident is required to provide the facility with 10 categories of documents. The facility is required to produce to the resident five categories of documents, but these categories do not include statements of staff members unless the statements are sworn statements that the facility will be offering at the arbitration hearing.[6] Additionally, the agreement expressly precludes the deposition of individuals involved in the resident's care other than treating physicians and experts.[7]

Section B of the agreement limits the liability of each of the parties. This provision, provides in pertinent part, the following:

---

5. Agreement §A.1.6.

6. *Id.* at §A.1.6(2).

7. *Id.* at §A.1.6(8).

"Liability for any claim brought by a party to this agreement against the other party, including but not limited to a claim by the facility for unpaid nursing home charges, or a claim by a resident, arising out of the care or treatment received by the resident at the facility, including, without limitation, claims for medical negligence or violation(s) of Pa. Code et seq., arising from simple or gross negligence, shall be limited as follows:

"(1) Net economic damages shall be awardable, including, but not limited to, past and future medical expenses, off-set by any collateral source payments; any outstanding liens shall be satisfied from the damages awarded.

"(2) Noneconomic damages shall be limited to a maximum of $250,000.

"(3) Interest on unpaid nursing home charges shall not be awarded.

"(4) Punitive damages shall not be awarded."[8]

The final paragraph of the agreement, section D.1.4, contains a standard severability clause. It provides that in the event any portion of the agreement is determined to be unenforceable or invalid, "the remainder of this arbitration agreement will be deemed to continue to be binding upon the parties hereto in the same manner as if the invalid or unenforceable provision were not a part of the arbitration agreement."[9]

Following her admission to Manor Care on January 13, 2004, Ms. Flueso remained a resident of the facility

---

8. *Id.* at §B.1.2.
9. *Id.* at §D.1.4.

until her death on June 28, 2005. Ms. Mannion has been appointed as administratrix of her mother's estate. In her complaint she alleges that Manor Care failed to provide adequate nursing care, fraudulently documented the care provided, and grossly understaffed the facility.

## DISCUSSION

Under the terms of the agreement all disputes between the parties,[10] including any personal injury claims arising from care provided at the Manor Care facility, are to be resolved by arbitration pursuant to the Pennsylvania Uniform Arbitration Act, 42 Pa.C.S. §7301 et seq. This Act provides:

"*Compelling arbitration.*—On application to a court to compel arbitration made by a party showing an agreement described in section 7303 (relating to validity of agreement to arbitrate) and a showing that an opposing party refused to arbitrate, the court shall order the parties to proceed with arbitration. If the opposing party denies the existence of an agreement to arbitrate, the court shall proceed summarily to determine the issue so raised and shall order the parties to proceed with arbitration if it finds for the moving party. Otherwise, the application shall be denied."[11]

---

10. The named parties to the agreement are Manor Care and Ms. Flueso. However, the agreement also covers officers and employees of Manor Care, such as Mr. Scarborough, and related corporations, with respect to claims arising from care provided at the Manor Care facility.

11. 42 Pa.C.S. §7304(a).

The existence of an agreement to arbitrate a dispute may be raised by preliminary objection.[12]

Agreements to arbitrate disputes are valid and enforceable under Pennsylvania law, "save upon such grounds as exist in law or in equity relating to the validity, enforceability or revocation of any contract."[13] In this case the plaintiff opposes the defendants' request to arbitrate their dispute on two grounds. The plaintiff first contends that the agreement is an unconscionable contract of adhesion because it limits the amount of damages that may be awarded as well as pre-hearing discovery. Secondly, the plaintiff contends that the agreement violates the Medicaid program under title XIX of the Social Security Act, also known as the Medicaid Act, 42 U.S.C. §1396r, and the Code of Federal Regulations on Medicare and Medicaid services at 42 C.F.R. §483.12(d)(3), because it constituted additional consideration that may not be imposed on a Medicaid patient such as Ms. Flueso as a condition for admission to a nursing home. For the reasons stated below, we find no merit in either of these contentions.

## I. *The Agreement To Arbitrate Is Not Unconscionable*

### A. Contract of Adhesion

The plaintiff argues that the agreement was a contract of adhesion. A contract of adhesion is defined as standard form contract prepared by one party, to be signed by the

---

12. Pa.R.C.P. §1028(a)(6).
13. 42 Pa.C.S. §7303.

party in a weaker position, usually a consumer, who has little choice about the terms. *Huegel v. Mifflin Construction Company Inc.,* 796 A.2d 350, 357 (Pa. Super. 2002).

The agreement at issue falls within this definition. It was a standard form document prepared by Manor Care for signature by new residents. It was to be signed by Ms. Mannion on behalf of her mother, a consumer of nursing home services to be provided by Manor Care. Given the circumstances, Ms. Mannion was in a weaker position without any meaningful choice when she signed the agreement. She was under great pressure to arrange very quickly for her mother to be moved from the hospital to a skilled nursing facility. Because of considerations of geography and availability Manor Care appeared to be the only suitable option. Ms. Mannion spoke by telephone with Louise DeFranco, the admission director at Manor Care, about the paperwork required for her mother's admission to the facility. Ms. DeFranco agreed to fax this paperwork to Ms. Mannion for her signature. When Ms. Mannion received the faxed paperwork, consisting of 21 pages, she did not have time to read the material carefully before signing and returning the documents. She was very upset at the time, and recalls the experience only as a blur. She acknowledges that she was aware that the paperwork included an agreement to arbitrate, but she did not understand that this would preclude her from pursuing a claim in court. Ms. DeFranco never explained the arbitration agreement to her. Nor was Ms. Mannion informed that she could make changes in the preprinted documents.

Section three of the agreement gives the signatory three business days to withdraw his/her consent to arbitrate disputes. However, this provision was at the bottom of page five of the six-page preprinted agreement, and it was not called to Ms. Mannion's attention. Considering the pressure she was under during this period of time, it is understandable that she felt she had little choice but to sign the documents as presented in order to assure her mother's placement in the facility. Thus, we find that the agreement was a contract of adhesion.

## B. Unconscionability

A contract of adhesion is not ipso facto unenforceable. It is unenforceable only to the extent that it is found to be unconscionable. *Lytle v. Citifinancial Services Inc.,* 810 A.2d 643 (Pa. Super. 2002).

"Once a contract is deemed to be one of adhesion, its terms must be analyzed to determine whether the contract as a whole, or specific provisions of it, are unconscionable." *Denlinger Inc. v. Dendler,* 415 Pa. Super. 164, 176, 608 A.2d 1061, 1067 (1992).

A contract term is unconscionable if (1) the party challenging it had no reasonable choice in accepting it, as in the case of a contract of adhesion, and (2) the provision unreasonably favors the other party. *Huegel,* 796 A.2d at 357 (holding that an arbitration clause was not unconscionable because it did not unreasonably favor the defendants). Although we have found the agreement to be a contract of adhesion, we do not believe that the provision for arbitration unreasonably favors either party. There is a strong public policy fa-

voring arbitration of disputes. *Commonwealth, Office of Administration v. Commonwealth, Pennsylvania Labor Relations Board,* 528 Pa. 472, 480, 598 A.2d 1274, 1277-78 (1991); *Flightways Corp. v. Keystone Helicopter Corp.,* 459 Pa. 660, 662-63, 331 A.2d 184, 185 (1975). Therefore, it is only the in the rarest of cases that an agreement to arbitrate will be unconscionable. There is a presumption that such an agreement is fair and does not unreasonably favor either party. Any doubt as to arbitrability should be resolved in favor of arbitration.

The plaintiff argues that the entire agreement is unconscionable because it contains limitations both on the damages that may be awarded and on the available discovery. These provisions, the plaintiff contends, are inextricably intertwined with the provision for arbitration and taint the entire agreement. We disagree. The agreement contains an explicit severability clause in section D.1.4. Under this section if any provision of the agreement is held to be unenforceable, the other provisions of the agreement are not to be affected. The agreement is to be construed as if it had never contained the unenforceable provision. This is consistent with the general principle of Pennsylvania law that if less than an entire agreement is invalid, and the invalid provision is not an essential part or the primary purpose of the agreement, then the remaining portions of the agreement are fully enforceable. *Huber v. Huber,* 323 Pa. Super. 530, 537-38, 470 A.2d 1385, 1389 (1984); *Forbes v. Forbes,* 159 Pa. Super. 243, 249, 48 A.2d 153, 156 (1946); Restatement (Second) of Contracts §184(1) (1981). In the instant case both the damage and discovery limitations are severable

from the remainder of the agreement and do not invalidate the provision for arbitration.

### 1. *The damages limitation*

The damages sought by the plaintiff on her claims include economic and noneconomic damages and punitive damages. Section B of the agreement requires the plaintiff to credit the amount of collateral source payments against any economic damage claim, limits the recovery of noneconomic damages to $250,000, and prohibits completely the recovery of punitive damages. However, although these limitations unreasonably favor the defendants[14] and hence are unenforceable in a contract of adhesion, they do not invalidate the arbitration provision.

The Sixth Circuit Court of Appeals dealt with a similar issue in *Morrison v. Circuit City Stores Inc.,* 317 F.3d 646 (6th Cir. 2003), a consolidated appeal, involving federal discrimination claims by individuals against their former employers. Each of the employment contracts contained a provision for arbitration as well as significant limitations on damages. The court recognized that a limitation on liability could undermine the Congressional intent behind a statute to compensate victims of discrimination and to deter wrongful behavior. In both of the cases under review the court held invalid a provision that limited recovery to one year of backpay, reimbursement of lost fringe benefits, two years of front pay,

---

14. Defendants' argument that the limitations are a fair trade-off for the defendants' waiver of interest on unpaid nursing home charges is disingenuous.

compensatory damages, and punitive damages up to $5,000 or the sum of the backpay and frontpay, whichever is greater. However, the court also held that the damage limitation was severable and the provision for arbitration valid.

We reached a similar conclusion in *Hughes v. Allied Inspection Services,* 50 Leh.L.J. 925 (2003), involving a home inspection contract. We held there that an unlawful limitation on damages was severable from the rest of the contract and did not invalidate the provision for arbitration of disputes.

In *Hughes* we distinguished the case of *Carll v. The Terminix International Company L.P.,* 793 A.2d 921 (Pa. Super. 2002), on which the plaintiff here relies. In *Carll* the Superior Court found that the contract language limiting liability was not independent of the agreement to arbitrate, and therefore struck the entire arbitration clause from the agreement. However, the arbitration clause in *Carll* was materially different from the provision for arbitration in both *Hughes* and the instant case. The provision in *Carll* read as follows:

"Arbitration. The purchaser (including anyone claming through purchaser) and Terminix agree that all matters in dispute between them . . . shall be settled exclusively by arbitration . . . [T]he award shall not, and the arbitrator shall not have the power or authority to, hold Terminix responsible for (i) the repair or replacement of any damage to the identified property, (ii) loss of anticipated rents and/or profits, (iii) direct, indirect, special, incidental, consequential, exemplary or punitive damages, or (iv) damages or penalties relating to or arising out of any

claim alleging any deceptive trade practice." *Carll,* 793 A.2d at 923.

The court noted that "[t]he arbitration provision not only provides for arbitration but at the same time limits the arbitrator's authority." *Id.* at 926. The arbitration provision specifically denies to the arbitrator the power or authority to make an award for repair or replacement of property; for loss of rents or profits; for "direct, indirect, special, incidental, consequential, exemplary or punitive damages"; or for deceptive trade practice claims. *Id.* at 923. Thus, the provision for arbitration was inextricably intertwined with the liability limitation. As a result, the entire arbitration clause was found invalid.

*Carll* is clearly distinguishable from this case because the arbitration provision in section A of the agreement is separate and distinct from the damage limitations in section B of the agreement, both location-wise and functionally. The damage limitations in section B may be stricken from the agreement without affecting the parties' agreement to arbitrate in section A. Moreover, as noted above, in the instant case the agreement contains an explicit severability clause in section D.1.4. There was no severability clause in *Carll.*

## 2. *The discovery limitation*

On the discovery issue, the United States Supreme Court in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20 (1991), reviewed the validity of discovery limitations in arbitration agreements. An employer sought to compel arbitration in a suit filed by a former employee

for age discrimination. The employee argued that the discovery allowed for in arbitration was more limited than that which is allowed under the federal rules. The court declined to find the discovery limitation unenforceable, and noted that "by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" *Id.* at 31, citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.,* 473 U.S. 614, 628 (1985). The court did carve out an exception where the litigant challenging the discovery limitation can show that the allowable discovery "will prove insufficient to allow . . . claimants . . . a fair opportunity to present their claims." *Id.* at 31.

Here, the plaintiff contends that the limitations placed on discovery are unfair and unreasonably favor the defendants because (1) the plaintiff is required to turn over a greater number of categories of material, and (2) the plaintiff is curtailed from acquiring evidence to support her theories of negligence. More specifically, the plaintiff asserts that she is prevented from deposing employees of Manor Care involved in the care of Ms. Flueso, other than treating physicians, and that she is also precluded from obtaining any policy and procedure manuals adopted by the defendants for the care of individuals like Ms. Flueso. Without the ability to acquire this information the plaintiff claims that she will be handicapped in developing many of her claims, and her expert may be limited in his ability to offer a meaningful opinion. We agree. The discovery limitations set forth in section A.1.6(1), (2) and (8) have the effect of severely restricting the plaintiff's ability to prepare and present her case.

By way of example, paragraph 71 of the complaint avers that

"(71) The nursing home defendants, acting by and through their agents, breached the duties set forth in the preceding paragraphs by:

"(a) failing to hire appropriately trained staff;

"(b) failing to appropriately train staff members; . . .

"(g) failing to maintain appropriate records, including failing to monitor and document significant changes in Marian Flueso's condition, intentionally failing to document all injuries and illnesses, altering, destroying, and/or rewriting records, as well as documenting care that was never given; . . .

"(p) grossly understaffing the facility; . . ."

The plaintiff is unable to depose staff members to develop these theories of liability. A limitation on discovery, such as this, may have a chilling effect on a person's capacity to pursue litigation. Thus, we find that the provisions for discovery in the agreement are one-sided and unreasonably favor Manor Care. Hence we find these limitations to be unconscionable and invalid.

However, as with the limitation on damages, the discovery limitations are severable. In view of the extensive discovery allowed to Manor Care under the agreement, it cannot be said that discovery limitations are an essential part or the primary purpose of the parties' agreement to resolve their disputes by arbitration. From a functional standpoint the agreement to arbitrate is self-sustaining even without sections A.1.6(1), (2) and (8); it is fully operable even if the discovery limitations are com-

pletely removed from the agreement. Therefore, we do not find it necessary to nullify the entire agreement. The arbitrator will be responsible for establishing fair ground rules for discovery in accordance with the Federal Rules of Civil Procedure.

## II. *The Legality of the Agreement*

The Medicaid program under title XIX of the Social Security Act, also known as the Medicaid Act, 42 U.S.C. §1396r, and the Code of Federal Regulations on Medicare and Medicaid Services at 42 C.F.R. §483.12(d)(3), prohibit a nursing facility that is admitting a patient entitled to medical assistance from Medicare or Medicaid from requiring any consideration as a precondition to admission into the facility. The plaintiff interprets the agreement as consideration that was required by the defendants as a condition for admitting Ms. Flueso to their facility. As a result, the plaintiff contends that the agreement was in violation of federal law and is unenforceable.

We find no merit in this argument for two reasons. First, there is no evidence that the agreement was in fact a prerequisite for admission to the facility. Although we have found that under the circumstances the plaintiff had no meaningful choice but to sign the agreement, this was based in large part on her state of mind in the emergency conditions under which she was functioning. Ms. DeFranco, the admission director for Manor Care, testified in her deposition that the agreement was voluntary and that it was for the family to decide whether or not they were going to be signing.[15] Significantly, the agree-

---

15. Deposition of Louise DeFranco, 5/2/06, at 48.

ment in section C permits a signatory to withdraw her consent to arbitration within three business days after execution. There is no indication in the agreement that a consequence of revocation would be a discharge from the facility. Accordingly, we cannot conclude on the evidence presented that the agreement was a requirement for admission into Manor Care.

Secondly, we do not view an agreement to arbitrate disputes as a prohibited consideration under the Medicare Act. We believe the intention of the Act and regulations in prohibiting additional consideration was to prohibit a nursing home from imposing financial or economic requirements on a Medicare patient beyond the payments to be provided by the government. In view of the strong federal policy in favor of arbitrating disputes, we decline to read the Medicare Act and regulations regarding consideration as applicable to an agreement to arbitrate.

## CONCLUSION

For the reasons stated, the defendants' preliminary objection pursuant to Pa.R.C.P. 1028(a)(6) is sustained, and this case is dismissed. The parties are to proceed to arbitration under the arbitration and limitation on liability agreement dated January 13, 2004.

## ORDER

Now, September 26, 2006, upon consideration of the defendants' preliminary objections to the complaint and plaintiff's response thereto, after review of the parties' briefs and for the reasons set forth in the accompanying opinion, including our finding that the limitations on

discovery in section A.1.6(1),(2) and (8) and the limitation on damages in section B of the arbitration and limitation of liability agreement are unconscionable and unenforceable, it is ordered that the preliminary objection to compel arbitration is sustained, and the complaint is dismissed without prejudice to the parties' right to proceed with arbitration of their dispute under the arbitration rules of the American Arbitration Association.