Mary Ellen SETLOCK, Executrix of the Estate of Mary Ryan, Deceased, Appellee

v.

**PINEBROOK PERSONAL CARE AND RETIREMENT CENTER, Appellant.**

Superior Court of Pennsylvania.

Argued May 1, 2012.

Filed Oct. 23, 2012.

Reargument Denied Dec. 28, 2012.

---

3. Pursuant to administrative regulations, a prisoner subject to a warrant of execution is to be interviewed by voting members of the Board of Pardons and is to be accorded a public hearing, at which a representative is to be allowed to make a presentation a maximum of thirty minutes in length. *See* 37 Pa.Code §§ 81.231(b), 81.263, 81.292. There is no requirement for the Board to hear witnesses; however, it may request or require persons to give testimony. *See id.* § 81.293. Persons wishing to provide information to the Board are to communicate or correspond with the Board's administrator. *See id.* at § 81.294. The ultimate discretionary decision to grant or deny clemency, of course, rests with the Governor. *See* Pa. Const. art. IV, § 9(a).

Donna J. Fudge, Philadelphia, for appellant.

John Kantner, Pottsville, for appellee.

BEFORE: GANTMAN, J., LAZARUS, J., and MUNDY, J.

OPINION BY MUNDY, J.:

Appellant, Pinebrook Personal Care and Retirement Center (Pinebrook), appeals from the August 2, 2011 order denying Pinebrook's petition to compel arbitration in the wrongful death action filed by Appellee, Mary Ellen Setlock, Executrix of the Estate of Mary Ryan, deceased. Because we conclude the Resident Agreement at issue did not contemplate or encompass tort claims, we affirm the trial court's order dismissing Pinebrooks' petition to compel arbitration.

The relevant facts and procedural history, as gleaned from the certified record, are as follows. On January 13, 2011, Appellee filed a complaint instituting a wrongful death and right of survivorship action against Pinebrook, seeking punitive damages, as well as damages for pain and suffering. Appellee's Complaint, 1/13/11, at 3–5. Thereafter, Appellee filed amended complaints on February 28, 2011 and on March 18, 2011. Appellee's March 18, 2011 amended complaint averred the following facts in support of her claim.

8. On or about November 3, 2010, Mary Ryan had an appointment with her treating physician, Dr. Carol Miller–Schaeffer of Pottsville Internists Associates.

8[.5]. [Pinebrook] arranged to have Ms. Ryan transported from the personal care facility to the doctor's office for purposes of this appointment.

9. [Pinebrook] assigned a transporter named "Agnes" to get Ms. Ryan to and from this appointment.

10. Mary Ryan was transported in a wheelchair obtained by, selected by, and maintained by [ ] Pinebrook.

11. [Pinebrook]'s transporter, "Agnes", pushed Ms. Ryan's wheelchair as she was wheelchair bound into the exam room at Pottsville Internists Associates so that Ms. Ryan could be examined.

12. On said date, and at the conclusion of the medical examination, the transporter, "Agnes", pushed Ms. Ryan's wheelchair so as to transport Ms. Ryan from the exam room through the medical offices.

13. A physician's assistant working at Pottsville Internists Associates, Deborah Coletta, heard "Agnes" tell Ms. Ryan, an elderly woman, to "lift her feet" as the wheelchair was being pushed through the medical offices.

14. The physician's assistant, Ms. Coletta, instructed "Agnes" to be careful as it was apparent that Ms. Ryan was not capable of lifting her feet as she was being pushed in the wheelchair.

15. [Pinebrook]'s employees, agents, servants, and ostensible agents, knew and were aware, that Ms. Ryan was not capable of lifting her feet during wheelchair transports.

16. On said date and time, the wheelchair was not equipped with footrests for Ms. Ryan to place her feet, despite the fact that footrests were available for this wheelchair and had in fact been provided with the wheelchair upon it's [sic] procurement by [Pinebrook]. Therefore, Ms. Ryan's feet were left to dangle freely during the transport, necessitating "Agnes" to instruct Ms. Ryan to lift her feet.

16[.5]. As a result of Ms. Ryan's inability to lift her feet as she was being pushed in the wheelchair, Ms. Ryan's feet became entangled below the wheelchair as she was being pushed causing her to be catapulted through the air from the wheelchair and landing on her head and face while striking the floor.

17. Due to Ms. Ryan's weakened condition, a safety harness had been obtained by [ ] Pinebrook for use during her wheelchair transports. However, "Agnes" failed to utilize this safety harness, or any other similar device.

18. When asked why she failed to utilize the harness, "Agnes" stated that she should have put the safety harness on before moving Ms. Ryan.

19. As a result of Ms. Ryan being catapulted from the wheelchair to the floor striking her head and face, Ms. Ryan suffered severe injuries requiring her hospitalization and ultimately leading to her death.

20. Ms. Ryan passed away from her injuries on November 25, 2010.

Appellee's Amended Complaint, 3/18/11, at 2–3.

On March 23, 2011, Pinebrook filed preliminary objections. Before the trial court ruled on Pinebrook's preliminary objections, on July 12, 2011, Pinebrook filed a "Petition to Compel Arbitration pursuant to 42 Pa.C.S. § 7304(a)[.]" In said petition, Pinebrook asserted it "learned of a binding agreement between the parties to arbitrate the case at bar[,]" referencing a Resident Agreement signed by Appellee and decedent, Mary Ryan. Pinebrook's Petition to Compel Arbitration, 7/12/11, at ¶ 4–5. Pinebrook attached a copy of the Resident Agreement, signed August, 1, 2010, and specifically cited paragraph 27 as the controlling provision in the instant matter. Paragraph 27 reads as follows.

Any Dispute controversy arising out of or in connection with under or pursuant to this Agreement shall be determined by arbitration under the then existing rules of the American Arbitration Association, or a mutually acceptable equivalent which determination shall be filed and be conclusive and binding upon the parties hereto and judgment thereon may be entered in any court having jurisdiction. The cost of said arbitration shall be born equally by the parties and be held in Schuylkill County, Pennsylvania.

Id. at ¶ 10; see also Pinebrook's Memorandum in Support of Petition to Compel Arbitration, 7/12/11, Exhibit B "Resident Agreement."

On July 25, 2011, Appellee filed an answer to Pinebrook's petition to compel arbitration asserting, *inter alia*, that it was "specifically denied that [Appellee] and/or decedent agreed to arbitrate disputes, particularly disputes arising in tort over professional services." Appellee's Answer to Petition to Compel Arbitration, 7/25/11, at ¶ 11. On August 2, 2011, the trial court denied Pinebrook's preliminary objections to Appellee's amended complaint. Trial Court Order Denying Preliminary Objections, 8/2/11, at 1. Additionally, on the same date, the trial court denied Pinebrook's petition to compel arbitration stating "that the Agreement between the parties does not contemplate the arbitration of tort claims[.]" [1] Trial Court Order, 8/2/11, at 1. Thereafter, on August 22, 2011, Pinebrook filed a timely notice of appeal.[2]

On appeal, Appellant presents the following issues for our review.

■ Whether the trial court erred in ruling that a contractual arbitration provision that required the parties to arbitrate "any dispute [or] controversy arising out of or in connection with, under or pursuant to this Agreement" did not contemplate the arbitration of the tort claims[?]

■ Whether [Appellee]'s claim that [Appellant] was negligent in transporting [Mary Ryan] to and from her doctor's appointment was "a dispute [or] controversy arising out of or in connection with, under or pursuant to" the parties' Agreement expressly provided that [Appellant] would assist

[Mary Ryan] with transportation to and from her doctor's appointments[?]

Appellant's Brief at 7.

As Appellant's issues are interrelated, we will address them concurrently. We begin by noting an appeal may properly "be taken from . . . [a] court order denying an application to compel arbitration[ ]." 42 Pa.C.S.A. § 7320(a)(1); *see also* Pa.R.A.P. 311(a)(8). In a recent decision of this Court, we restated our well-established standard governing an appeal from a denial of a motion to compel arbitration.

We review a trial court's denial of a motion to compel arbitration for an abuse of discretion and to determine whether the trial court's findings are supported by substantial evidence. In doing so, we employ a two-part test to determine whether the trial court should have compelled arbitration. The first determination is whether a valid agreement to arbitrate exists. The second determination is whether the dispute is within the scope of the agreement.

Whether a claim is within the scope of an arbitration provision is a matter of contract, and as with all questions of law, our review of the trial court's conclusion is plenary. The scope of arbitration is determined by the **intention of the parties** as ascertained in accordance with the rules governing contracts generally. These are questions of law and our review is plenary.

Arbitration is a matter of contract, and parties to a contract cannot be compelled to arbitrate a given issue absent an agreement between them to arbitrate that issue. Even though it is now the

1. In support of its order the trial court cited *Midomo Company, Inc. v. Presbyterian Housing Development Company*, 739 A.2d 180 (Pa.Super.1999), which will be discussed *infra*.

2. The trial court did not order Pinebrook to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On November 18, 2011, in lieu of a Rule 1925(a) opinion the trial court filed a statement adopting its August 2, 2011 order as said opinion.

policy of the law to favor settlement of disputes by arbitration and to promote the swift and orderly disposition of claims, **arbitration agreements are to be strictly construed and such agreements should not be extended by implication.**

*Elwyn v. DeLuca,* 48 A.3d 457, 461 (Pa.Super.2012) (citations and quotation marks omitted; emphasis added).

Accordingly, we must first ascertain "whether a valid agreement to arbitrate exists." *Id.* at 461. On August 2, 2010 the subject Resident Agreement was executed and signed by Mary Ryan as "Resident", Mary Ellen Setlock as "Resident Representative", and an "Administrator" for Pinebrook. Resident Agreement, 8/1/10, at 9 (attached as Exhibit B to Pinebrook's Motion to Compel Arbitration). Said agreement stated, "[a]ny dispute arising out of or in connection with under or pursuant to this Agreement shall be determined by arbitration[.]" *Id.* at 8, ¶ 27. As neither party disputes the existence of the Resident Agreement, we are satisfied the first inquiry, the existence of a valid agreement to arbitrate, is met. We caution however, that our determination that an agreement to arbitrate any disputes under the Resident Agreement exists, does not mean we conclude the instant wrongful death action is within the scope of the Resident Agreement.[3]

Next, we must determine "whether the dispute is within the scope of the agreement." *Elwyn, supra* at 461. Pinebrook avers that, "the parties used contractual language that has been repeatedly and consistently described by Pennsylvania courts as indicating a 'broadest possible,' 'unlimited' and 'one method only' arbitration provision." Pinebrook's Brief at 12. Pinebrook further argues, "[i]t is well established that an agreement to arbitrate disputes 'arising from' a contract encompasses tort claims when the facts which support the tort claims would also support a breach of contract claim." *Id.* at 13.

On the contrary, Appellee argues that "[t]he Resident Agreement signed by the parties makes no mention whatsoever of [ ] Pinebrook agreeing to provide professional medical and nursing services." Appellee's Brief at 5. Further, Appellee argues the agreement does not "mention in any way an agreement to properly train its professional staff and/or to provide safe, adequate, and functioning durable medical equipment such as the wheelchair." *Id.* Appellee concludes, "[w]ithin the four corners of the Resident Agreement, it is clear that the parties contemplated only the provision of the basic personal care services, living quarters, and agreements for the fees to be charged." *Id.* We are inclined to agree.

In reaching its decision to dismiss Pinebrook's petition to compel arbitration, the trial court relied on *Midomo Company, Inc. v. Presbyterian Housing Development Company,* 739 A.2d 180 (Pa.Super.1999). Herein, as in *Midomo,* "while there is no dispute that an agreement to arbitrate exists between Midomo and [appellants] as to certain classes of claims, the issue whether [appellants] may compel arbitration under

---

3. Additionally, while we need not reach the issue, we find it noteworthy to mention that in the instant matter, the Resident Agreement may be an adhesion contract. "An adhesion contract, according to Black's Law Dictionary (5th ed.1979), is a standardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain[.]" *Denlinger, Inc. v. Dendler,* 415 Pa.Super. 164, 608 A.2d 1061, 1066 (1992). The record is inconclusive as to what, if any, bargaining power Appellee or Mary Ryan had in entering into the Resident Agreement and accepting its terms, including the arbitration clause contained in paragraph 27.

the terms of that agreement is disputed." *Id.* at 187. To guide in our review, we believe a brief discussion of the underlying facts of *Midomo* is necessary.

In 1997 the appellants and Midomo executed a Lease Agreement, wherein the appellants contracted with Midomo to develop property known as the "Hanover Property." *Id.* at 184–185. Said property was to be the future cite of a personal care facility for the elderly. *Id.* at 184. Based on assurances from the appellants, Midomo incurred costs and expenses towards the development of the property. In March 1998, Midomo filed a six-count complaint against the appellants averring, *inter alia,* fraudulent misrepresentation and non-disclosure, and negligent misrepresentation and non-disclosure.[4] *Id.* at 186. Thereafter, the appellants filed preliminary objections in the nature of a petition to compel arbitration in accordance with the Lease Agreement, which were denied by the trial court. *Id.*

On appeal, this Court noted that "[w]hen one party to an agreement seeks to prevent another from proceeding to arbitration, judicial inquiry is limited to determining (1) whether a valid agreement to arbitrate exists between the parties and, if so, (2) whether the dispute involved is within the scope of the arbitration provision." *Id.* at 187 (citation omitted). Cognizant of our standard this Court maintained, "[a]rbitration is a matter of contract and, as such, it is for the court to determine whether an express agreement between the parties to arbitrate exists." *Id.* (citations omitted).

The *Midomo* Court began its inquiry by looking at "Section 37" of the Lease Agreement governing arbitration. Said provision specifically articulated five specific scenarios that, if disputed, should first attempt to be resolved by the senior executives of each party, and if that fails, by arbitration. *Id.* at 187–188. The agreement noted that "[t]he procedures specified in this Section 37 are the sole and exclusive procedures for the resolution of disputes to which this Section 37 is intended to apply." *Id.* at 188. Further, the agreement stated "in those instances where Section 37 does not apply, the parties submit to the jurisdiction of any appropriate court within that state for adjudication of disputes arising from this agreement." *Id.* Therefore, this Court was left to determine whether the issues raised were encompassed under the five scenarios of Section 37.

After reviewing the Lease Agreement, the *Midomo* Court concluded that Midomo's claims of fraudulent misrepresentation and non-disclosure, and negligent misrepresentation and non-disclosure, were outside the scope of the five scenarios subject to arbitration. *Id.* at 189. In reaching said conclusion, the *Midomo* Court relied in part on *Flightways Corp. v. Keystone Helicopter Corp.,* 459 Pa. 660, 331 A.2d 184 (1975), and noted that, "[o]ur [S]upreme [C]ourt has previously held that where a contract provides for arbitration of all claims or **disputes arising out of or relating to the contract,** the parties intended to submit all of their grievances to arbitration, regardless of whether the claims sounded in tort or contract."[5] *Id.*

---

4. Midomo also alleged specific counts against individual appellants for breach of the Lease Agreement's contingency clause, interference with contract, breach of oral contract, and breach of contract implied in fact. *Id.* at 186. As these counts are not relevant to the out-

come of this appeal we have elected not to discuss them.

5. However, we are compelled to note that we disagree with the *Midomo* Court's unsupported conclusion that "where a contract provides for arbitration ... the parties intended to

at 188 The *Midomo* Court, therefore, held that the critical analysis in determining whether an arbitration provision applies hinges on whether the dispute arises out of the contract. As a result, our focus herein becomes the scope of the Resident Agreement.

■ In the instant matter, the pertinent language of the Residential Agreement sets forth the following.

Now therefore, in consideration of the foregoing and in consideration of the Center and Resident's undertakings, promises, covenants and conditions contained herein, the parties agree to the following:

1. *Resident Room Choice*—Resident agrees to a private (type room)[.] At a fee of $ 95.00/day.

2. *Routine Personal Care Services Provided.* Center shall provide the following basic and specific services as needed:

a. *Basic Services*—Center will provide basic assistance with personal hy-giene; basic assistance with tasks of daily living; a daily program of activities to provide social, physical, intellectual and recreational activities in a planned, coordinated and structured manner.

b. *Specific Services*—Center will provide Resident specific services as identified in Resident's support plan more fully described in Article 13b.

. . .

6. *Fee, Billing and Payment.* Resident agrees to pay Center for room, board, meals, and personal care services in accordance with the Rate Schedule (Attachment 1).[6] Resident agrees to the "Special Care Fees for Residents with Higher Acuity" fee structure as identified in Attachment 2. Billing for services will be done in advance for the subsequent 30 or 31–day (monthly) period. Payments for services are to be made by the 15th of the month.

. . .

submit all of their grievances to arbitration, **regardless of whether the claims sounded in tort or contract."** *Id.* (emphasis added). Nowhere in *Flightways Corp.* does our Supreme Court make such a broad conclusion regarding tort claims. Rather, *Flightways Corp.* involved a claim that the controlling contract was invalid on the basis of fraud in the inducement or mutual mistake. *Flightways Corp., supra* at 185. In affirming the trial court's order compelling arbitration, our Supreme Court concluded "a general attack on a contract for fraud is to be decided under the applicable arbitration provision as a severable part of the contract and that only where the claim of fraud in the inducement goes specifically to the arbitration provision itself should it be adjudicated by the court rather than the arbitrator[.]" *Id.* at 186 (citation omitted). As a result, while we do agree that degree of applicability of an arbitration clause is controlled by the scope of the agreement, we conclude that the *Midomo* Court's broad conclusion based on *Flightways Corp.*, that when an arbitration clause exists all claims are sub-ject to arbitration regardless of whether sounded in tort or contract, is unsupported. Rather, the scope of the agreement is controlling.

6. Attachment 1 includes the following language which is the basis of Pinebrook's averment that the Resident Agreement encompasses the instant matter.

Transportation is provided to Doctor/Hospital/Dentist with a minimal fee.
1. The charge for the trip is $15.00 round trip plus a certified escort fee of $15.00/hour. If the trip exceeds 25 miles an additional charge of 55 cents/mile will be added.
2. If STS is used, there is no charge for transportation. If an escort is required there is a charge of $15.00/hr for the escort.

Pinebrook's Memorandum in Support of Petition to Compel Arbitration, 7/12/11, Exhibit B "Resident Agreement," "Attachment 1."

21. *Visits to a Physician, Clinic, or Hospital*—If Resident should require a visit to a physician, clinic, or hospital. The Center will assist Resident in arranging for such visits.

. . .

27. *Arbitration*—Any Dispute controversy arising out of or in connection with under or pursuant to this Agreement shall be determined by arbitration under the then existing rules of the American Arbitration Association, or a mutually acceptable equivalent which determination shall be filed and be conclusive and binding upon the parties hereto and judgment thereon may be entered in any court having jurisdiction. The cost of said arbitration shall be born equally by the parties and be held in Schuylkill County, Pennsylvania.

Pinebrook's Memorandum in Support of Petition to Compel Arbitration, 7/12/11, Exhibit B "Resident Agreement." The remainder of the omitted paragraphs deal with issues such as, "billing and payment," "late fees," "room & board increases," "personal needs allowance," "medications," "emergency care," "confidentiality," "financial services," and the like, but makes no mention of the medical care to be provided by Pinebrook.

We conclude that to make the leap to include tort liability for the wrongful death of Mary Ryan as encompassed under the terms of the Residential Agreement is far too attenuated. We are mindful of the fact that the arbitration provision at issue herein does not specifically articulate scenarios in which arbitration should apply as the clause in *Midomo* did. Nevertheless, it is clear that the scope of the Residential Agreement primarily governed the financial options and obligations of the residents and their representatives, and included a provision for arbitrating any disputes arising within those areas covered by the agreement.

In *Smay v. E.R. Stuebner, Inc.*, 864 A.2d 1266 (Pa.Super.2004), this Court dealt with a similar issue in determining whether the trial court erred in denying a motion to compel arbitration filed on behalf of a construction company whose employee was injured after falling from a scissor lift at a construction site. *Id.* at 1269. In reversing the trial court, the *Smay* Court concluded "the instant arbitration clause is written to encompass 'Any controversy or Claim arising out of or related to the Contract[,]' and by its own terms the clause must be read broadly to include all claims arising from the contract regardless of whether the claim sounds in tort or contract." *Id.* at 1276 (citation omitted). Notably, the *Smay* Court held the appellant's claim was actually an issue of contract law, not of tort, but "even if the dispute is framed, as [the a]ppellees suggest, as involving the underlying tort claim, it remains within the scope of the arbitration agreement." *Id.* at 1274–1275. The *Smay* Court then looked to the language of the contract and concluded as follows.

> Under the terms of the contract documents, Appellees are entitled to indemnification from Appellant only if they can demonstrate that Mr. Smay's injury: 1) arose or resulted from Appellant's work under the contract, and 2) **was caused in whole or in part by Appellant's negligent acts or omissions.** Since the contract requires that the parties arbitrate "[a]ny controversy or Claim arising out of or related to the Contract" and **Appellees aver that the injury arose from the contract, their indemnity claims clearly are subject to arbitration.** *See* General Conditions § 4.5.1, at 12. Hence, we find that the broad contract language manifests the parties' clear intent to resolve the in-

stant dispute in arbitration. We reach this conclusion mindful that the facts supporting Appellees' claims are not entirely distinct from Mr. Smay's underlying tort action.

*Id.* at 1273 (emphasis added). The language of the contract in *Smay* contemplated the cause of action and intended to encompass claims based on negligence.[7]

Guided by the aforementioned case law in this Commonwealth, we conclude the arbitration clause at issue, while broader than the clause in *Midomo*, only applies to causes of actions arising from issues governed by the Resident Agreement. Nowhere in said agreement is there a clause governing the standard of medical care to be provided by Pinebrook's employees. Moreover, the Resident Agreement does not account for liability of Pinebrook based on actions at the facility or off premises at another facility. The mere fact that Resident Agreement included a payment schedule for transporting residents to and from the doctor's appointment cannot be extended to encompass all claims sounding in tort that may have arisen from such transportation. Had the parties intended such an outcome, the Resident Agreement could have expressly included it. In the absence of such a clause we will not extend the agreement beyond that which was intended by the parties.

Therefore, the instant wrongful death action is a distinctly different cause of action from anything contemplated by the terms of the residential agreement, and as a result Appellee should not be compelled to arbitrate the matter.

Accordingly, because we conclude that the wrongful death action instituted by Appellee does not arise from a dispute involving the Resident Agreement, we affirm the trial court's August 2, 2011 order denying Pinebrook's petition to compel arbitration.

Order affirmed.

Judge GANTMAN files a Dissenting Opinion.

DISSENTING OPINION BY GANTMAN, J.:

I respectfully disagree with the majority's decision to affirm. Instead, I would hold that the Resident Agreement and its arbitration clause encompassed Appellee's wrongful death action and reverse the order denying Appellant's petition to compel arbitration. Hence, I dissent.

Pennsylvania courts strongly favor arbitration for the resolution of legal disputes. *Ross Development Co. v. Advanced Bldg. Development, Inc.*, 803 A.2d 194, 196 (Pa.Super.2002) (citing cases). Under Pennsylvania law, interpretation of arbitration agreements involves two competing principles:

> (1) arbitration agreements are to be strictly construed and not extended by implication; and (2) when parties have agreed to arbitrate in a clear and unmistakable manner, every reasonable effort should be made to favor the agreement unless it may be said with positive assurance that the arbitration clause involved is not susceptible to an interpretation that covers the asserted dispute.

---

7. Instantly, our holding does not preclude all contracts which include an arbitration clause from encompassing tort liability. Rather, we hold that where a contract in no way discusses liability for a cause of action, the arbitration clause in the unrelated contract between the parties cannot be read so broadly as to encompass any and all disputes that arise between the parties. Such an outcome leads to a result beyond the intent of the parties at the time of entertaining into a contract such as the lease agreement in *Midomo*, or resident agreement in the instant matter.

To resolve this tension, courts should apply the rules of contractual construction, adopting an interpretation that gives paramount importance to the intent of the parties and ascribes the most reasonable, probable, and natural conduct to the parties. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language in the written agreement.

*Callan v. Oxford Land Development, Inc.,* 858 A.2d 1229, 1233 (Pa.Super.2004) (quoting *Highmark Inc. v. Hospital Service Ass'n. of Northeastern Pennsylvania,* 785 A.2d 93, 98 (Pa.Super.2001), appeal denied, 568 Pa. 720, 797 A.2d 914 (2002)) (internal citations and quotation marks omitted).

> In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language was chosen carelessly. When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent.

*Melton v. Melton,* 831 A.2d 646, 653–54 (Pa.Super.2003) (quoting *Profit Wize Marketing v. Wiest,* 812 A.2d 1270, 1274 (Pa.Super.2002)). In other words, the intent of the parties is generally the writing itself. *Kripp v. Kripp,* 578 Pa. 82, 90, 849 A.2d 1159, 1163 (2004). Moreover, "a contract must be construed as a whole and the parties' intentions must be ascertained from the entire instrument; effect must be given to each part of a contract." *Purdy v. Purdy,* 715 A.2d 473, 475 (1998), *appeal denied,* 568 Pa. 648, 794 A.2d 363 (1999).

"Where a contract dispute arises between parties to a contract containing an unlimited arbitration clause, the parties must resolve their dispute through arbitration." *Callan, supra* at 1233.

Unless the parties impose some limitation on the arbitrator's authority, the arbitrator may decide all matters necessary to dispose of any disputed claims subject to arbitration and, the court may not impose any restrictions *sua sponte.* Accordingly, "all" contract disputes does mean "all" contract disputes unless otherwise agreed by the parties.

An agreement to arbitrate disputes arising from a contract encompasses tort claims where the facts which support a tort action also support a breach of contract action. A claim's substance, not its styling, controls whether the complaining party must proceed to arbitration or may file in the court of common pleas.

*Id.* at 1233 (internal citations omitted). *See also Midomo Co., Inc. v. Presbyterian Housing Development Co.,* 739 A.2d 180, 188 (Pa.Super.1999) (explaining: "[W]here a contract provides for arbitration of all claims or disputes arising out of or relating to the contract, the parties intended to submit all of their grievances to arbitration, regardless of whether the claims sounded in tort or contract"); *Shadduck v. Christopher J. Kaclik, Inc.,* 713 A.2d 635 (Pa.Super.1998) (holding parties intended to submit all of grievances to arbitration, regardless of whether claims sounded in tort or contract; arbitration provision did not include limiting language that only contract claims fell within purview of agreement).

Contrary to the majority's assertion, Appellee's wrongful death action is not a distinctly different cause of action from anything contemplated by the terms of the Resident Agreement. Significantly, the Resident Agreement covered "Routine Personal Care Services" including basic assistance with tasks of daily living, which Appellant agreed to provide for Decedent. (*See* Resident Agreement, attached as Exhibit B to Appellant's Petition to Compel

Arbitration at 1, § 2.a.; R.R. at 25a). The Resident Agreement also covered "Visits to a Physician, Clinic, or Hospital." "If Resident should require a visit to a physician, clinic, or hospital. The Center will assist Resident in arranging for such visits." (*Id.* at 6, § 21.; R.R. at 30a). The parties appended a rate schedule to the Resident Agreement, setting forth the costs for transportation services and escorts to Decedent's medical appointments. (*Id.* at 12; R.R. at 35a). Moreover, the Resident Agreement included the following unlimited arbitration clause:

> Any dispute [or] controversy **arising out of or in connection with under or pursuant to this Agreement** shall be determined by arbitration under the then existing rules of the American Arbitration Association, or a mutually acceptable equivalent, which determination shall be filed and be conclusive and binding upon the parties hereto and judgment thereon may be entered in any court having jurisdiction. The cost of said arbitration shall be born equally by the parties and be held in Schuylkill County Pennsylvania.

(*Id.* at 8, § 27.; R.R. at 32a) (emphasis added).

The majority emphasizes that the Resident Agreement contained no clause "governing the standard of medical care to be provided by [Appellant's] employees," which I think is irrelevant because Appellee's amended complaint does not address "medical care" provided by Appellant's employees. Rather, the amended complaint averred Decedent suffered injuries during transportation from the retirement center to a doctor's appointment. The complaint specified that Appellant arranged for the transportation, assigned an escort to assist Decedent, and the escort was pushing Decedent's wheelchair at the time of the accident. Here, the alleged tortious conduct arose out of or in connection with the Resident Agreement, which directly involved the companion and transportation services Appellant provided for Decedent's medical appointments. Further, the parties placed no limiting language in the arbitration clause; therefore, the parties contemplated arbitration for any controversy connected to the Resident Agreement.

In my opinion, Appellee's tort claims are fundamentally connected to the services provided under the resident Agreement and therefore subject to the arbitration clause in the Resident Agreement. *See Callan, supra.* The majority minimizes the importance of this broad arbitration provision and, instead, applies and extends *Midomo, supra* as if *Midomo* were the general rule (while at the same time calling that case into question), and not the exception to the general rule in favor of enforcing arbitration agreements. *See Ross Development Co., supra.* Contrary to the majority, I am convinced the arbitration clause at issue encompassed Appellee's tort claim; and the trial court erred in denying Appellant's petition to compel arbitration. Accordingly, I dissent.