J-A26019-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| KRIEBEL MINERALS, INC.; KRIEBEL PRODUCTION CO.; KRIEBEL RESOURCES COMPANY; JGG PARTNERS, L.P.; K & K MINERAL RESOURCES CO.; KRIEBEL GAS & OIL, INC.; KMSD, LLC; KRIEBEL PRODUCTION CO. LLC; KRIEBEL LEASING LLC; KRIEBEL RESOURCES CO., LLC; KRIEBEL RESOURCES; AND K & K MINERALS LLC | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : | No. 352 WDA 2024 |
| EQT CORPORATION; EQT PRODUCTION COMPANY | : : : : | |
| Appellants | : | |

Appeal from the Order Entered March 4, 2024
In the Court of Common Pleas of Clarion County Civil Division at No(s):
581 CD 2023

BEFORE:  BOWES, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BECK, J.:                    **FILED: MARCH 14, 2025**

EQT Corporation and EQT Production Company (collectively, "EQT") appeal from the order entered in the Clarion County Court of Common Pleas ("trial court") denying EQT's motion to compel arbitration.[1]  As we find no error in the trial court's decision in the instant case, we affirm.

---

[1]  An order denying a motion to compel arbitration is appealable as of right. **See** 42 Pa.C.S. § 7320(a)(1).

This case involves a purchase and sale agreement ("PSA") Kriebel Minerals, Inc., Kriebel Production Co., Kriebel Resources Company, JGG Partners, L.P., K&K Mineral Resources Co., Kriebel Gas & Oil, Inc., KMSD, LLC, Kriebel Production Co. LLC, Kriebel Leasing LLC, Kriebel Resources, and K&K Minerals LLC (collectively "Kriebel") executed with Range Resources-Appalachia, LLC ("Range Resources"). Pursuant to the PSA, Kriebel transferred certain oil and gas leasing rights located in southwestern Pennsylvania to Range Resources. Range Resources, who is not a party to this case, subsequently assigned these rights to EQT.

Of relevance to this appeal, under the PSA, if EQT decides to drill or participate in the development of a well located on any leased land conveyed by the PSA, Kriebel maintains the right to elect to participate in such drilling interest. Section 11.5 of the PSA governs Kriebel's election rights and provides as follows[2]:

**11.5 Participation of [Kriebel]**

(a) [Kriebel] and any Permitted Participation Assignee shall have the right to elect to participate for up to an aggregate of 15% of the Drilling Party's interest in each well (proportionately reduced to the number of acres out of the Leases included in the production unit for such well) to be drilled in the Deep Rights by or on behalf of such Drilling Party upon any Lease, any Jointly Owned AMI Interest or any lands pooled or unitized therewith (collectively, the "Participation Lands") in accordance with the terms and conditions of this Section 11.5.

---

[2] For purpose of clarity, the term "Buyer" in the PSA refers to EQT as Range Resources assigned its rights under the PSA to EQT.

(b) If Buyer or its successors and assigns with respect to the Participation Lands (Buyer and or such successors and assigns, a "Drilling Party") decides to drill or participate in the drilling of any such well, then such Drilling Party shall provide to [Kriebel] notice of such Drilling Party's decision to drill or participate in the drilling of any such well, which notice (the "Well Notice") shall include an AFE covering such well and the drilling thereof. Such AFE shall include the out of pocket acquisition costs incurred by such Drilling Party with respect to the Leases and/or leases covering the Participating Lands (which costs with respect to the interests in the Leases purchased hereunder, shall be calculated on the basis of … per Net Mineral Acre).

(c) [Kriebel] (on its own behalf and/or on behalf of any Permitted Participation Assignee) shall have the right to elect to participate in the drilling of such well by delivering to such Drilling Party, on or before the close of business on the 15th day following its receipt of a Well Notice (the "Election Date"), a notice of the election to participate in such well by such Person(s) and the amount of such interest (up to such 15% interest) in which such Person(s) elect to participate (the "Well Interest"), together with all amounts (in immediately available funds) that are attributable to such Well Interest based upon the amounts set forth in the AFE (the "Participation Costs") delivered by Drilling Party to KMI with respect to such well. Any failure by [Kriebel] to deliver such notice and pay such Participation Costs on or before the close of business on the Election Date shall be deemed an election by [Kriebel] and the Permitted Participation Assignees to not participate in the drilling of the well described in the applicable Well Notice.

(d) If [Kriebel] (on its own behalf and/or on behalf of any Permitted Participation Assignee) timely elects to participate in the drilling of a well described in any Well Notice and pays the applicable Participation Costs in accordance with the foregoing, then Drilling Party within 5 days of its receipt of such election notice and Participation Costs, shall assign to such Person(s) its/their Well Interest in the production unit formed for such well. Such assignment shall be in a form mutually agreeable to such Drilling Party and [Kriebel] and shall be without warranty of title except for a special warranty of title by, through and under such Drilling Party. All operations with respect to any well in which [Kriebel] or any Permitted Participation Assignee elects to participate in accordance with this Section 11.5 and the production unit formed therefore shall be governed by [a Joint Operating

Agreement ("JOA"), the form of which is attached hereto as "Exhibit E"].

Complaint, 9/1/2023, Exhibit A (hereinafter, "PSA") § 11.5.

The JOA contains the following arbitration clause:

**I. Arbitration:**

Any controversy relating to this agreement shall be settled by three (3) disinterested non-related parties, one (1) selected by [Kriebel], one (1) by [Range Resources], and the remaining one (1) to be appointed by first two (2) so selected; and the majority decision of the three (3) arbitrators shall be final and conclusive. The arbitrators shall be jointly instructed by [Kriebel] and [Range Resources] to choose between the position taken on that issue by [Kriebel] and the position taken on that issue by [Range Resources], as opposed to adopting either a compromise position or any position not taken by [Kriebel] or [Range Resources]. The arbitrators shall report their conclusions in writing to the parties as promptly as possible after submission of the matter to arbitration, but in any event within thirty (30) days after such submission. The arbitrators' ruling will be binding upon the parties. The non-prevailing party will pay the fees and expenses of the arbitrators. A party will be the "prevailing party" if the position proposed by that party is the position determined by the arbitrators. Such arbitration shall occur in Pittsburgh, Pennsylvania.

PSA, Exhibit E (hereinafter, "JOA") at Art. XVI, ¶ I (hereinafter, "arbitration clause").

The interpretation of section 11.5 of the PSA previously came before this Court in ***Kriebel Minerals, Inc. v. EQT Corporation***, 1427 WDA 2022, 2024 WL 365147, at *1 (Pa. Super. Jan. 31, 2024) (non-precedential decision) (hereinafter "***Kriebel I***"). In ***Kriebel I***, Kriebel learned that EQT was drilling

- 4 -

on leased land included in the PSA.[3] **Kriebel I**, 2024 WL 365147, at \*3. Kriebel instituted a civil action and began their pre-complaint discovery pursuant to Pennsylvania Rule of Civil Procedure 4003.8.[4] **Id.** In response to Kriebel's initial discovery requests, EQT filed a motion to compel arbitration in which it asserted that any causes of action Kriebel sought to assert relating to their rights under the PSA were covered by a mandatory arbitration agreement incorporated into the PSA through the JOA. **Id.** The trial court denied the motion to compel arbitration, concluding that the terms of the JOA did not apply, as Kriebel had not elected to participate in any drilling. **Id.** at 4. As we will discuss further below, this Court affirmed the trial court's order denying EQT's motion to compel arbitration. **See id.** at \*5-\*8.

In the case now pending before this Court, the record reflects that on March 27, 2019, EQT notified Kriebel by letter, pursuant to section 11.5(b) of the PSA, of its intent to develop the River #3 Production Unit ("River Pad") on the border of Greene and Washington Counties, as the drilling involved leases covered by the PSA. **See** Complaint, 9/1/2023, ¶ 10. On March 31, 2019, Kriebel executed its election to participate pursuant to section 11.5(c) and on

---

[3] The particular leases at issue in **Kriebel I** are not at issue in this case.

[4] Under Rule 4003.8, "[a] plaintiff may obtain pre-complaint discovery where the information sought is material and necessary to the filing of the complaint and the discovery will not cause unreasonable annoyance, embarrassment, oppression, burden or expense to any person or party." Pa.R.Civ.P. 4003.8(a).

April 8, 2019, remitted $468,451.56 to EQT for its participation costs in the development of the River Pad ("participation payment"). According to Kriebel, on July 15, 2019, they learned that EQT did not intend for the River Pad to begin producing gas for consumption until June 2022 even though EQT had already spudded and topset[5] the River Pad in 2016 and 2017. *Id.* ¶¶ 16-17. Kriebel alleged that the delay in production was the result of EQT's inability to successfully negotiate a lease with the Bureau of Land Management ("BOLM") to drill on certain public lands that comprised the River Pad. *Id.* ¶ 17. On July 17, 2019, Kriebel demanded that EQT return the participation payment. EQT returned $403,136.56 of the participation payment, but retained the remaining $65,315 ("disputed funds") as costs associated with its earlier spudding and topsetting of the River Pad.

On September 1, 2023, Kriebel filed a complaint in which it raised claims of fraud, breach of contract, and unjust enrichment. *See id.* ¶¶ 23-47. Kriebel asserted that EQT fraudulently induced its election to participate in the development and drilling of the River Pad, and also breached the PSA by failing to inform Kriebel that it had yet to procure a lease from the BOLM before it

_____

[5] As EQT explains, "'[s]pudding' is a standard term in the oil and gas industry that refers to the first boring of the hole in the drilling of an oil and gas well." EQT's Brief at 26 (quotation marks, brackets, and citation omitted). "Topsetting" is also "a standard term that refers to the process of drilling a well down to the selected shale gas formation and properly encasing the well to prevent the release of gas and other chemicals into the ground surrounding the well bore." *Id.* (quotation marks and citation omitted).

could proceed with the development of the River Pad. ***See id.*** Kriebel sought the return of the disputed funds. ***Id.*** ¶ 47.

On September 22, 2023, EQT filed a motion to compel arbitration. EQT asserted that under ***Kriebel I***, because Kriebel had elected to participate in the development of the River Pad, the JOA governed this dispute, and its arbitration clause was applicable to this case. ***See*** Motion to Compel Arbitration, 9/22/2023, ¶¶ 16-37. It further asserted that the JOA applied because other provisions of the JOA applied to the claims raised in the complaint. ***Id.*** ¶¶ 29-37. On March 4, 2024, the trial court denied EQT's motion to compel arbitration, finding that, regardless of Kriebel's election to participate in the development of the River Pad, the claims Kriebel raised in its complaint were "based solely on the provisions of the PSA governing the process for electing to participate in a well" and "do not pertain" to the operations of any well, rendering the JOA inapplicable. Trial Court Opinion, 3/4/2024, at 5 (pagination added).

EQT timely appealed to this Court. Both EQT and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925. EQT presents the following issue for review: "Whether the trial court erred when it denied [EQT's] motion to compel arbitration on the basis that the arbitration agreement within the JOA does not apply to claims relating to natural gas wells in which [Kriebel] elected to participate?" EQT's Brief at 5 (unnecessary capitalization omitted).

Our standard and scope of review are as follows:

We review a trial court's denial of a motion to compel arbitration for an abuse of discretion and to determine whether the trial court's findings are supported by substantial evidence. In doing so, we employ a two-part test to determine whether the trial court should have compelled arbitration. The first determination is whether a valid agreement to arbitrate exists. The second determination is whether the dispute is within the scope of the agreement.

Whether a claim is within the scope of an arbitration provision is a matter of contract, and as with all questions of law, our review of the trial court's conclusion is plenary. The scope of arbitration is determined by the intention of the parties as ascertained in accordance with the rules governing contracts generally. These are questions of law and our review is plenary.

Arbitration is a matter of contract, and parties to a contract cannot be compelled to arbitrate a given issue absent an agreement between them to arbitrate that issue. Even though it is now the policy of the law to favor settlement of disputes by arbitration and to promote the swift and orderly disposition of claims, **arbitration agreements are to be strictly construed and such agreements should not be extended by implication.**

*Setlock v. Pinebrook Pers. Care and Ret. Ctr.*, 56 A.3d 904, 907-08 (Pa. Super. 2012) (emphasis in original, citation omitted).

"Pennsylvania has a well-established public policy that favors arbitration, and this policy aligns with the federal approach expressed in the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (FAA)[, …] appl[ying] equally to all arbitration agreements." *Humphrey v. GlaxoSmithKline PLC*, A.3d 8, 13 (Pa. Super. 2021) (quotation marks and citations omitted). We have explained, however, that "the policy favoring arbitration was not intended to render arbitration agreements more enforceable than other contracts, and the

FAA was not designed to preempt all state law related to arbitration." **Id.** (quotation marks and citation omitted). "Thus, when addressing the specific issue of whether there is a valid agreement to arbitrate, courts generally should apply ordinary state-law principles that govern the formation of contracts, but in doing so, must give due regard to the federal policy favoring arbitration." **Id.** at 13-14 (quotation marks and citations omitted). State contract law governs the scope of arbitration agreements. **Id.** at 14.

The parties do not dispute the existence or validity of the JOA or its arbitration clause on appeal. We must therefore proceed to the second step and determine whether the dispute for which EQT seeks to compel arbitration falls within the scope of the arbitration clause. **See Setlock**, 56 A.3d at 907.

When interpreting a contract, "the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." **Provenzano v. Ohio Valley Gen. Hosp.**, 121 A.3d 1085, 1095 (Pa. Super. 2015) (citation omitted). In ascertaining the intent of the parties,

> the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject matter of the agreement. The court will adopt an interpretation that is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement.

**Id.** (citation omitted)

EQT raises three arguments in support of its claim that the trial court erred in denying its motion to compel arbitration. First, EQT argues that in

- 9 -

*Kriebel I*, Kriebel only argued, and this Court only held, that JOA applies pursuant to section 11.5 if there is an election to participate; no other prerequisite existed to its applicability. EQT's Brief at 17-18. EQT maintains that judicial estoppel precludes Kriebel from now arguing that more (i.e., that the claim raised must also relate to "operations") is required for the JOA to apply:

> Having successfully argued in *Kriebel I* that the JOA and its arbitration agreement apply only when an election has been made to participate in wells in Participation Lands and defeated a motion to compel arbitration in that case as a result, [] Kriebel [] should have been bound by that argument here and estopped from asserting any additional factors for applicability.

*Id.* at 19.

Second, EQT contends that the dispute in this case arises from certain provisions in the JOA, not the PSA, and thus, the arbitration is applicable to this case. *Id.* at 19-23. It cites to various provisions of the JOA that address "pre-drilling activities," three of which it contends has particular significance and applicability to the claims raised by Kriebel. *Id.* at 20-23 (citing JOA, Arts. IV, VI.A, VI.B).

Third, EQT argues that the trial court erred by limiting the applicability of the JOA to claims concerning "participation in the drilling of a well." *Id.* at 23. According to EQT, "the trial court's conflation of 'operations' with the drilling of a well improperly limited the application of the JOA and its arbitration agreement," again contending that other provisions of the JOA— for example, Article IV.A—fall within the definition of "operations" as defined

by Pennsylvania law. *Id.* at 24-25. Even if the trial court's interpretation was accurate, and the JOA is limited to claims raised related to drilling operations, Kriebel's claims do fall under the JOA, as they seek the return of the disputed funds, which, in turn, were spent on spudding and topsetting—"processes [that] involve 'operations' by any reasonable definition of the term." *Id.* at 26.

*Kriebel I* involved a dispute between Kriebel and EQT regarding EQT's failure to provide notice to Kriebel under section 11.5 of the PSA that it was drilling and producing gas on leases included the PSA. *Kriebel I*, 2024 WL 365147, at *3. EQT argued that the arbitration clause of the JOA contained broad language, as it stated that it applied to "[a]ny controversy relating to this agreement[,]" and that the arbitration clause was incorporated by reference into the PSA. *Id.* at *5.

In rejecting this argument, we determined that the issue before the Court was the interplay between the PSA and the JOA and whether the parties intended for the arbitration clause in the JOA to apply to the election process set forth in section 11.5 of the PSA. *Id.* The Court explained that the parties did not intend for the provisions of the PSA to be subject to arbitration because the PSA did not contain an arbitration clause, but that they did intend for disputes arising under the JOA to be subject to arbitration because the JOA did contain an arbitration clause. *Id.* Interpreting the language in the arbitration clause stating that it applied to "[a]ny controversy relating to this

agreement" to apply to the PSA, as EQT contended, was too broad an interpretation, as section 11.5(d) of the PSA states only that "if" Kriebel elects to participate in the development of a well on a lease included in the PSA, all operations of the well "shall be governed by the JOA." **Id.** at \*\*5-6 (quoting PSA § 11.5(d)). We further determined that the words "this agreement" contained in the arbitration clause of the JOA was limiting language that referred solely to the JOA. **Id.** at \*6. Thus, this Court concluded that "**absent an election to participate** under Section 11.5 of the PSA, **the JOA does not apply**." **Id.** at \*6 (emphasis in original).

> We additionally explained:

> To the extent that [EQT] insist that the language in the [a]rbitration [c]lause is so "broad" as to evidence the parties' intent to arbitrate all claims regarding election notices and participation rights, regardless of whether [Kriebel] exercised their participation rights, we emphasize that [EQT] again ignore[s] the terms of the documents and fail[s] to recognize the self-limiting language contained in the JOA.

**Id.** at \*7.

EQT now asserts that **Kriebel I** stands for the proposition that once Kriebel elects to participate in the development of a well on a lease included in the PSA, the JOA applies to all disputes between the parties and those disputes are therefore subject to arbitration under the arbitration clause. EQT's Brief at 16-19. **Kriebel I**, however, makes no such declaration. Rather, **Kriebel I** only states that the JOA applies to disputes between the parties **if** Kriebel elects to participate in the development of a well on a lease included

in the PSA. *Id.* at *7 (emphasis added). *Kriebel I* makes no suggestion that once Kriebel elects to participate, the JOA applies to any and all disputes between the parties. *See id.* at *5-*7. Instead, in *Kriebel I*, this Court expressly stated that the PSA, which does not contain an arbitration clause, applies to controversies involving the election process, and that "if the parties intended an arbitration clause to apply to the provisions of the PSA outlining the election process, then an arbitration clause should have been included in the PSA itself." *Id.* at *8 (quotations marks, brackets, and citation omitted).

Contrary to EQT's contention, our holding of *Kriebel I* also does not limit either the trial court's or this Court's authority and duty to conduct a review of the plain language of the PSA based upon the new circumstances that have arisen in the case at bar. The facts and circumstances before the Court *Kriebel I* differ from those now before us as we previously were only tasked with determining whether, as a matter of law, the PSA required an election to participate prior to the arbitration provision of the JOA to apply. We held that it does. We are now tasked with determining whether, under the particular circumstances of this case, the plain language of section 11.5 of the PSA apply to the claims raised by Kriebel.

With respect to the doctrine of judicial estoppel, this Court has stated that "[a]s a general rule, a party to an action is estopped from assuming a position inconsistent with his or her assertion in a previous action, if his or her contention was successfully maintained." *Yoder v. McCarthy Constr., Inc.*,

291 A.3d 1, 15 (Pa. Super. 2023) (citation omitted). "Accordingly, judicial estoppel is properly applied only if the court concludes the following: (1) that the appellant assumed an inconsistent position in an earlier action; and (2) that the appellant's contention was successfully maintained in that action. **Black v. Labor Ready, Inc.**, 995 A.2d 875, 878 (Pa. Super. 2010) (citation omitted).

In this case, the trial court determined that the facts underlying Kriebel's claims of fraud, breach of contract, and unjust enrichment in its complaint do not involve "operations" as required for the JOA to apply under the plain language of section 11.5 of the PSA, and instead relate exclusively to the election process, as they assert that EQT did not provide them with all the information to which they were entitled prior to making their decision on whether to elect to participate in the development of the River Pad. **See** Complaint, 9/1/2023, at 16-17, 23-47. Thus, finding that the arbitration clause of the JOA does not apply because this case involves claims arising from the election process of the PSA is not inconsistent with **Kriebel I** and, consequently, is not precluded by the doctrine of judicial estoppel. **See Kriebel I**, 2024 WL 365147, at **5-7; **see also Yoder**, 291 A.3d at 15.

EQT's attempt to point us to different provisions of the JOA that it contends applies to the claims raised by Kriebel is a dead end. As we held in **Kriebel I**, the JOA is only applicable to the parties by virtue of its incorporation by reference in section 11.5 of the PSA. **See Kriebel I**, 2024 WL 365147, at

*6. Therefore, unless we conclude that the prerequisites contained in section 11.5 of the PSA are satisfied, the JOA is irrelevant.

With this in mind, we turn to the question of whether the trial court correctly found that the claims raised by Kriebel in the complaint underlying this appeal relate to the elections process and do not pertain to "operations" as the court found section 11.5 of the PSA requires for the case to be referred to arbitration. At the outset, we agree with the trial court that the plain language of section 11.5 clearly and unambiguously states that the JOA governs "**[a]ll operations** with respect to any well in which [Kriebel] … **elects to participate** in accordance with this Section 11.5 **and the production unit formed therefore**[.]" PSA § 11.5(d) (emphasis added). Thus, for the arbitration clause of the JOA to apply, any claims raised by Kriebel must pertain to operations of a well in which Kriebel has elected to participate.

We agree with EQT that section 11.5 is not limited to "drilling operations," but instead expressly extends to "[a]ll operations… of a well." However, our review of the trial court's opinion is that is precisely what it found:

> [T]he claims raised by Kriebel [] in its complaint against EQT do not involve "operations" of the well in which they elected to participation. Instead, just as in Case No. 245 of 2022, Kriebel['s] claims focus on the provisions of the PSA regarding the process of the election to participate and whether EQT properly complied with the notice requirements set forth therein. Kriebel['s] claims are clearly based solely on the provisions of the PSA governing the process for electing to participate in a well. While Kriebel [] has no doubt made an election to participate, the claims raised in the

complaint do not pertain to "all operations with respect to any well ... or production unit formed thereof."

Trial Court Opinion, 3/4/2024, at 4-5. We find no error in the trial court's conclusion that the prerequisites for the applicability of the JOA under section 11.5 are not met here.

"To determine whether a plaintiff's claims fall within the scope of an arbitration clause, we must consider the factual underpinnings of the claim rather than the legal theory alleged in the complaint." **Saltzman v. Thomas Jefferson Univ. Hosp., Inc.**, 166 A.3d 465, 476 (Pa. Super. 2017) (quotation marks and citation omitted). Importantly, "[a] claim's substance, not its styling, controls whether the complaining party must proceed to arbitration or may file in the court of common pleas." **Callan v. Oxford Land Dev., Inc.**, 858 A.2d 1229, 1233 (Pa. Super. 2004).

In its complaint, Kriebel raised three claims, sounding in fraud, breach of contract, and unjust enrichment, based upon EQT's alleged failure to inform them of production delays that were the result of EQT's inability to successfully procure the lease it needed from the BOLM to drill on certain public lands that comprised the River Pad. Complaint, 9/1/2023, ¶¶ 16-17, 23-47. Kriebel asserts that EQT did not inform Kriebel of its inability to obtain the BOLM lease in EQT's election notice and that EQT was required to do so under section 11.5(b) of the PSA. **Id.** ¶¶ 12, 16-19, 34-41. In other words, Kriebel asserts that its election was invalid because it was based upon faulty and incomplete information.

The factual underpinnings of Kriebel's complaint plainly relate to the election process of section 11.5 of the PSA and not to the operations of a well. *See Saltzman*, 166 A.3d at 476; PSA, § 11.5(d). No matter how Kriebel styled the claims raised in its complaint, the substance of those claims is that EQT withheld material information from Kriebel in EQT's election notice, which improperly induced Kriebel to elect to participate in the development of the River Pad. *See Callan*, 858 A.2d at 1233. Although the disputed funds were costs stemming from spudding and topsetting the River Pad, Kriebel's claims has nothing to do with these operations—the claims raised do not relate, for example, to the way EQT spent those funds or how much EQT spent on those activities. Rather, Kriebel's claims relate directly to the validity of its election in light of EQT's alleged failure to inform Kriebel that it had not yet procured a lease from the BOLM to drill the River Pad. *See* Complaint, 9/1/2023, at 16-17. As we held in *Kriebel I*, the PSA, not the JOA, applies to controversies involving the election process, and "if the parties intended an arbitration clause to apply to the provisions of the PSA outlining the election process, then an arbitration clause should have been included in the PSA itself." *Kriebel I*, 2024 WL 365147, at *8 (quotations marks, brackets, and citation omitted).

Based on the foregoing, we conclude that the trial court did not err in determining that the PSA, and not the JOA, governed the instant dispute between Kriebel and EQT and that the arbitration clause did not apply to this

case. We therefore affirm the order denying EQT's motion to compel arbitration.

Order affirmed.

President Judge Emeritus Bender joins this Memorandum.

Judge Bowes files a Dissenting Memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/14/2025